Herrick, Feinstein LLP
Paul Rubin (PR-2097)
Joshua J. Angel (JA-3288)
2 Park Avenue
New York, NY 10016
Tel:  212-592-1606
Fax:  212-592-1500

Larry I. Glick, P.C.
Larry I. Glick, Esq.
1305 Franklin Avenue
Garden City, NY  11530
Tel:  516-739-1111

Attorneys For Appellants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**DOCUMENT ELECTRONICALLY FILED**

```
- - - - - - - - - - - - - - - - - - - - - - - - - x
In re:                                            :
                                                  :
    East 44th Realty LLC,                         :
                                                  :
                        Debtor.                   :
                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - x
                                                  :
    G SQUARED ASSOCIATES LLC, G                   :
    SQUARED MANAGEMENT LLC, ALLEN                 :
    GUTTERMAN, and MARK GUTTERMAN,                :
                                                  :
                        Appellants,               :
                                                  :
            -against-                             :
                                                  :
    DAVID R. KITTAY, as Chapter 11                :
    Trustee of East 44th Realty LLC,              :
                                                  :
                        Appellee.                 :
- - - - - - - - - - - - - - - - - - - - - - - - - x
```

Case No.  07-CV-09565 (PAC)

(Bankruptcy Appeal)

# <u>APPELLANTS' BRIEF</u>

## Table of Contents

STATEMENT OF BASIS OF APPELLATE JURISDICTION.......................................................1

STATEMENT OF THE CASE.................................................................................................1

ISSUES PRESENTED...........................................................................................................3

STANDARD OF APPELLATE REVIEW................................................................................3

STATEMENT OF FACTS .....................................................................................................4

    A.  The Trustee's Sale Motion.........................................................................................4

    B.  The Trustee Worked with G Squared to Induce it to Bid .........................................6

    C.  The Auction and the Statement By the
        Trustee's Counsel Regarding the Timing of the Closing.........................................8

    D.  Suddenly, the Trustee Insists on Closing on One Business Days' Notice..................9

    E.  The Trustee Negotiates Terms of a Closing with
        G Squared Without Disclosing His Prior Agreement
        to Allow Global to Close On or Before October 11, 2007 ......................................12

    F.  The Trustee Slams the Door Shut on G Squared ...................................................14

THE BANKRUPTCY COURT'S RULING ............................................................................15

ARGUMENT.......................................................................................................................16

POINT I .............................................................................................................................16

    The Motion Should Have Been Denied Because the
    Trustee Did Not Have Discretion to Discriminate Unfairly Against G Squared...............16

    A.  The Trustee Had a Duty to Treat All Bidders Fairly,
        Without Favoring One Bidder Over Another, and to
        Exercise His Discretion in a Non-Arbitrary Manner .............................................16

    B.  The Bankruptcy Court Failed to Recognize That Unfairness
        Toward Bidders Constitutes Grounds to Deny the Trustee's Motion.......................17

    C.  The Trustee's Harsh and Unfair Treatment of G Squared
        Warranted Denial of the Motion Under the Circumstances.....................................19

POINT II .............................................................................................................................21

    The Bankruptcy Court Erred Because Equity Abhors a
    Forfeiture and The Estate Was Not Entitled To An Unjust Windfall................................21

    A.  There Are Important Equitable Principles to Which the
        Bankruptcy Court Failed to Afford Due Consideration...........................................21

    B.  Consideration of the Target II Decision Also Supports Reversal.......................22

CONCLUSION....................................................................................................................25

## Table of Authorities

### Cases

### Federal

In re Aquatic Dev. Group, Inc.
   352 F.3d 671 (2d Cir. 2003 ...................................................................3

In re Bowman
   181 B.R. 836 (Bankr. D.Md. 1995) ......................................................16

In re Chung King, Inc.
   753 F.2d 547 (7th Cir. 1985) ................................................................18

Citibank, N.A. v. Andros
   666 F.2d 1192 (8th Cir. 1981) ..............................................................16

In re First Central Financial Corp.
   377 F.3d 209 (2d Cir. 2004)...................................................................3

In re Frankel
   191 B.R. 564 (Bankr. S.D.N.Y. 1995) .................................................18

In re Gordon Car and Truck Rental, Inc.
   59 B.R. 956 (Bankr. N.D.N.Y. 1985) ...................................................21

In re Moulded Products, Inc.
   474 F.2d 220 (8th Cir. 1973) ................................................................16

In re O.P.M. Leasing Services, Inc.
   13 B.R. 64 (S.D.N.Y. 1981)..................................................................16

M.R.R. Traders, Inc. v. Cave Atlantique, Inc.
   788 F.2d 816 (1st Cir. 1986).................................................................18

In re Stanley Engineering Corp.
   164 F.2d 316 (3rd Cir. 1947) ................................................................18

In re Target Two Assocs., L.P.
   2006 WL 3068668 (S.D.N.Y. Oct. 27, 2006) .......................................17

In re Target Two Assocs., L.P.
   2005 WL 1140538 (S.D.N.Y. May 16, 2005) .......................................21

Travellers Int'l, A.G. v. Trans World Airlines, Inc.
    41 F.3d 1570 (2d Cir. 1994)...............................................................................17

In re Wingspread Corporation
    92 B.R. 87 (Bankr. S.D.N.Y. 1988) ..................................................................25

Zervos v. Verizon N.Y., Inc.
    252 F.3d 163 (2d Cir. 2001)................................................................................4

**State**

151 W. Assoc. v. Printsiples
    92 A.D.2d 76, 459 N.Y.S.2d 605 (1st Dep't 1983) ...........................................21

Dalton v. Educational Testing Serv.
    87 N.Y.2d 384, 639 N.Y.S.2d 977 (1995) ........................................................17

**Statutes**

28 U.S.C. § 158(a)(1)....................................................................................................1

G Squared Management LLC, G Squared Associates LLC, Allen Gutterman and Mark Gutterman (collectively, the "Appellants") by and through their undersigned attorneys, respectfully submit this Brief in Support of their Appeal from the "Order Authorizing Release of Escrowed Funds to Estate in Accordance with Court's August 9, 2007 Order" of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), Hon. Robert D. Drain, dated September 12, 2007 and entered on September 13, 2007 (the "Order"). (Dock. No. 306)

## STATEMENT OF BASIS OF APPELLATE JURISDICTION

28 U.S.C. § 158(a)(1) provides that "district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders and decrees" of bankruptcy judges. Accordingly, this Court has jurisdiction to consider Appellants' appeal from the Bankruptcy Court's entry of the Order.

## STATEMENT OF THE CASE

A trustee in bankruptcy has a duty of impartiality to treat all parties fairly and equally. Here, following a bankruptcy auction, the Chapter 11 trustee applied extremely lenient and generous rules in dealing with his stalking horse bidder, and a totally different, extremely rigid rule while dealing with Appellants. The Trustee had initially induced Appellants to submit their bid by deviating from court-ordered bidding procedures, causing them to believe that, if they were the successful bidders, he would act in a fair and reasonable fashion to permit Appellants to close on their purchase. Instead, just one day after the auction sale was conducted and Appellants' bid was accepted, the Trustee suddenly demanded that Appellants close the purchase on the next business day, setting up Appellants for failure and placing Appellants in a position where their $1.67 million deposit was subject to forfeiture.

1

Compounding the Trustee's unfair treatment of Appellants, after he declared Appellants to be in default for not closing on one business day's notice, the Trustee turned around and allowed his original stalking horse bidder seven weeks in which to close.  The Trustee granted this seven week extension even though the timing of the closing under the Trustee's contract with Appellants was identical to, and indeed copied from, the Trustee's contract with that other bidder.  Moreover, when the Trustee was demanding that Appellants close on one business day's notice, he already knew that his stalking horse bidder needed approximately six weeks to close.

When Appellants balked at having to close within one day, the Trustee initially demanded that Appellants pay an immediate, non-refundable additional deposit of $500,000 in exchange for a three business day closing adjournment. After Appellants protested that a three day extension was insufficient, the Trustee increased he demand to $830,000 for a fifteen business day adjournment.  In stark contrast, the Trustee allowed the stalking horse bidder, who already had ten weeks to prepare for a closing since it signed its contract, a seven week closing adjournment, and a full week in which to increase its deposit by only an additional $80,000.

The trustee's disparate treatment of Appellants and his stalking horse bidder is striking. To allow such plainly uneven conduct toward bidders, under the guise of "the exercise of discretion," permits a trustee to act unfairly and partially, and to tip the playing field so as to favor a particular bidder when a debtor's property is for sale.

The Second Circuit has stated that the conduct of bankruptcy proceedings must not only be right, it should **seem** right. See In re Haupt, 361 F.2d 164, 168 (2d Cir. 1966).  Unfairness toward bidders has been recognized as a ground to overturn the results of a bankruptcy auction. To permit disparate treatment of bidders by a bankruptcy trustee, based on unfounded excuses

that do not withstand scrutiny, opens the door to mischief and manipulation and the tainting of the integrity of the bankruptcy auction sale process.

Moreover, a bankruptcy court is a court of equity. Equity abhors a forfeiture and will avoid an unjust windfall. Here, the Bankruptcy Court erred in granting the Trustee's motion without adequately evaluating whether to do so would confer an undeserved windfall upon the debtor's estate. Here, the Bankruptcy Court's ruling conferred such an undeserved windfall, because it was undisputed that the proceeds of the purchase by either Appellants or the stalking horse bidder would produce sufficient funds to pay all creditors in full.

## ISSUES PRESENTED

1. Did the Bankruptcy Court err by failing to recognize that unfair treatment of bidders constitutes grounds to order a return of G Squared's deposit?

2. Did the Bankruptcy Court err in rejecting Appellants' arguments that the Trustee's refusal to grant a reasonable adjournment to close was an abuse of discretion, arbitrary or irrational?

3. Did the Bankruptcy Court err in granting the Motion because it (a) failed to balance the harm to Appellants against the benefits to the Debtor's estate, (b) conferred an undeserved and inequitable windfall upon the Debtor's estate, and (c) effected an unwarranted forfeiture?

4. Did the Bankruptcy Court err when it authorized release of escrowed funds without appropriately evaluating Appellant's equitable arguments?

## STANDARD OF APPELLATE REVIEW

When sitting as a court of appellate review of decisions of a bankruptcy court pursuant to 28 U.S.C. § 158(a), a district court reviews the bankruptcy court's factual findings under the "clearly erroneous" standard and that court's conclusions of law de novo. Fed. R. Bankr. P. 8013; In re First Central Financial Corp., 377 F.3d 209, 212 (2d Cir. 2004).

A bankruptcy court's exercise of equitable discretion is reviewed for abuse of discretion. In re Aquatic Dev. Group, Inc., 352 F.3d 671, 673 (2d Cir. 2003). Abuses of discretion include

(1) a decision resting on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding; or (2) a decision that, though not the product of legal error or a clearly erroneous factual finding, cannot be located within the range of permissible decisions. See id. at 678; Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 169 (2d Cir. 2001).

## STATEMENT OF FACTS

On August 5, 2005, East 44th Realty, LLC (the "Debtor") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the Bankruptcy Court.  On February 14, 2007, the Bankruptcy Court ordered the appointment of a Chapter 11 trustee for the Debtor, and thereafter David R. Kittay (the "Trustee") was appointed to serve as that trustee.

**A.**    **The Trustee's Sale Motion**

On June 14, 2007, the Trustee filed with the Bankruptcy Court a motion (the "Sale Motion") seeking authorization to sell the Debtor's right, title and interest as tenant under a ground lease (the "Ground Lease") for a multi-story property located at 228-238 East 44th Street, New York, New York (the "Property").  The Sale Motion identified Global Capital Holding LLC ("Global") as the intended purchaser under a contract dated as of June 4, 2007 for $16.2 million, subject to higher and better offers and Bankruptcy Court approval.  See Affidavit of Trustee's counsel Judith L. Siegel dated September 11, 2007, p.2, ¶¶ 2-6 (Ex. A to Dock. No. 302).  The Trustee's contract with Global provided that the closing would take place "on the next business day after notice of entry of the Sale Order.  TIME SHALL BE OF THE ESSENCE as to Purchaser's obligations hereunder to consummate the closing on such date."  (Dock. No. 248, p.2, Section 3).  Under the Trustee's proposed contract of sale, Global, the stalking horse bidder,

would receive a break-up fee in the amount of $300,000 if the Ground Lease were sold to another bidder for a higher amount.  (Id., p.8, Section 6).

As the Bankruptcy Court observed, the proceeds of a sale to Global under its proposed contract would generate sufficient funds to pay all creditors in the Debtor's bankruptcy case and likely produce a dividend for the Debtor's equity holders.  (Dock. No. 322, p.88, lines 1-6).

On July 13, 2007 the Bankruptcy Court entered an order fixing the bidding procedures ("Bidding Procedures")(Ex. A to Ex. A to Dock. No. 302) for an auction sale of the Property. The Bidding Procedures provided that the rules for the auction adopted by the Trustee, in his discretion, must be fair and open, with no participating qualified bidder disadvantaged in any material way as compared to any other qualified bidder.  Id., ¶ 1.D(i).  The Bidding Procedures fixed August 2, 2007 (the "Bid Deadline") as the deadline for submitting bids, and it required that, before submitting a bid, a potential bidder had to be qualified to bid by the Trustee.  Id., ¶2.F.  The Bidding Procedures did not contain a mechanism, or otherwise permit, for a bid to be withdrawn after submission.

The Bidding Procedures provided that, in order to qualify, a potential bidder had to demonstrate the financial capability to consummate the purchase of the Ground Lease, and that the Trustee, in his sole discretion, had to determine that the potential bidder, if selected as the successful bidder, is likely to consummate the purchase.  See Id., ¶2.F.

The Bidding Procedures provided that, if the successful bidder did not close, then, without further court order or notice to anyone, the Trustee shall close with the qualified bidder that submitted the next highest bid, and that both the successful bid and the next highest bid shall be kept open and irrevocable until the closing of the sale.  See Id, ¶1.F.

**B.    The Trustee Worked with G Squared to Induce it to Bid**

As part of the bidder qualification process, counsel for appellants G Squared Associates LLC and G Squared Management LLC (collectively "G Squared") forwarded relevant financial information to the Trustee, which plainly disclosed that G Squared did not have sufficient liquid assets to purchase the Ground Lease. Glick Decl., ¶5 (Dock. No. 297). Although the Trustee's office requested additional details regarding various aspects of this financial information, it did not request details or documents concerning G Squared's intention or ability to finance the purchase of the Ground Lease. See id.

In order to decide whether to submit a bid, Appellants asked the Trustee for permission to meet a representative of the landlord under the Ground Lease (the "Landlord"). Due to scheduling conflicts, that meeting could not be arranged for a date that preceded the Bid Deadline. Accordingly, the meeting with the Landlord was scheduled for August 6, 2007, four days after the Bid Deadline had passed. Nevertheless, in recognition of the importance of that meeting, and to induce G Squared to bid, the Trustee exercised his discretion to alter the Bidding Procedures, and represented through counsel that G Squared would be permitted to withdraw its bid after the Bid Deadline if G Squared were dissatisfied following its meeting with the Landlord's representative. See Declaration of Larry I. Glick, Esq. dated September 6, 2007 (the "Glick Decl."), p.2, ¶¶ 6-8 (Dock. No. 297), and Exhibit A thereto (August 1, 2007, 10:13 a.m. e-mail from Trustee's counsel, Michelle Gershfeld, Esq. to Larry Glick). G Squared's counsel viewed the Trustee's agreement to allow G Squared to withdraw its bid after the meeting--even though this was not permitted under the Bidding Procedures--as an indication that the Trustee would exercise his discretion in the sale process fairly and rationally, and would not arbitrarily apply the terms and conditions of the Bidding Procedures. Glick Decl., ¶ 8.

On August 1, 2007 G Squared submitted its bid to purchase the Ground Lease for $16.7 million (the "G Squared Bid"). With that submission, G Squared wire transferred a deposit of $1.67 million to the Trustee (the "G Squared Deposit"). Glick Decl., ¶ 9 (Dock. No. 297).

The G Squared Bid did not contain a financing contingency. In submitting its bid, G Squared was aware that, though the closing could take place as early as one business day following entry of an order approving the sale of the Property, the Trustee had discretion under the sale agreement to adjourn the closing for his own reasons or at the request of the successful bidder. Sale Agreement, ¶ 3 (Ex. B to Dock. No. 289). G Squared understood that the Trustee would exercise his discretion in a commercially reasonable manner in scheduling the closing. See Glick Aff., ¶10.

On August 6, 2007, G Squared met with the Landlord's representative, in the presence of the Trustee's counsel. On the following day, G Squared's counsel inquired as to whether G Squared was qualified by the Trustee. He was told that G Squared had been qualified and that notice of qualification had been sent to G Squared's broker in Florida. This constituted another deviation from the Bidding Procedures, which had required the notice to be sent to G Squared's counsel. Glick Decl., ¶ 13 (Dock. No. 297).

The Trustee's counsel also advised counsel for G Squared at that time that the Trustee had to "fight" to convince the Landlord's representative, Mr. Tofel, that G Squared was a "qualified" bidder. See id. In other words, the Trustee's counsel gave G Squared the impression that the Trustee was going out of his way to enable G Squared to participate.

No bidder besides G Squared was qualified by the Trustee to bid against Global for the Ground Lease.

7

**C.    The Auction and the Statement By the**
       <u>Trustee's Counsel Regarding the Timing of the Closing</u>

On August 8, 2007 at 1:00 p.m. the Trustee conducted an auction for the Ground Lease

(the "Auction").  G Squared submitted a bid of $16.7 million, the minimum amount that any

competing bidder could submit under the Bidding Procedures  Bidding Procedures, ¶1.C (Ex. A

to Ex. A to Dock. No. 302).  The next highest, and only other bid submitted at the Auction, was

Global's previously submitted bid for $16.2 million under its contract with the Trustee.  At the

close of the Auction, Appellants executed the sale-purchase agreement for the Ground Lease (the

"Sale Agreement').  <u>See</u> Glick Decl., ¶¶ 5 and 14.  (Dock. No. 297).

The terms of the Sale Agreement are virtually identical to Global's contract that the

Trustee submitted to the Bankruptcy Court with his June 13 Sale Motion.  Both agreements

confer upon the Trustee discretion to adjourn the closing of the sale at the buyer's request, and

specifically state: "Seller may in his sole discretion, but it is in no way required to, agree to

adjourn the closing at the request of Purchaser." Sale Agreement, ¶ 3 (Ex. B to Dock. No. 289).

While the Sale Agreement was being executed, G Squared's bankruptcy court counsel,

Larry Glick was asked about the anticipated timing of a closing.  He responded that he was

bankruptcy counsel for G Squared, that he would not be handling the closing, and that those

arrangements should be discussed with G Squared's real estate counsel.  Glick Decl., ¶ 14.

At approximately 4:00 p.m. on August 8, 2007, the Bankruptcy Court held a hearing

regarding the Trustee's request for entry of an order approving the sale of the Ground Lease to G

Squared (the "Sale Hearing").  <u>See</u> 8/8/07 Trans., p. 48, line 23 through page 49, lines 13-25.

(Ex. B to Dock. No. 297).  At the Sale Hearing, the Trustee's counsel confirmed that G Squared

was the winning bidder, and represented to the Bankruptcy Court that "this sale is unopposed",

"there's no opposition to this motion", and the equity owner of the Debtor, Mr. Bildirici, had "no objection to the sale." 8/8/07 Trans., p.48, line 22, p. 49, lines 13-25. (Ex. B to Dock. No. 297).

Before the Sale Hearing concluded, Global's counsel asked the Bankruptcy Court to order the release from escrow and return of its deposit ($1.62 million). The Bankruptcy Court denied that relief because the Bidding Procedures required the next highest bid to remain open and irrevocably in place as the backup bid in case the successful bidder failed to close, to be held until two business days after the closing of the sale transaction. Bidding Procedures, ¶1.F, p.2.

Before denying Global's request, the Bankruptcy Court inquired of the Trustee's counsel as to the anticipated date of closing. 8/08/07 Trans., p.50, line 24. (Ex. B to Dock No. 297). The Trustee's counsel turned to her client and representatives of the other parties present at the hearing for guidance as to the closing date. Glick Decl., ¶17. Not receiving any such guidance, she responded "promptly." Glick Decl., ¶17; Ex. B thereto, p.50, line 25. At no time during the Sale Hearing did the Trustee or his counsel advise anyone that the Trustee would not cooperate with G Squared in scheduling the closing, nor did they manifest an intent to send a closing notice the very next day so as to insist on closing on just one business days' written notice of the entry of the Sale Order. Glick Decl., ¶17.

**D.**    **Suddenly, the Trustee Insists on Closing on One Business Days' Notice**

On the morning of August 9, 2007, Mr. Glick was contacted by the Trustee's real estate counsel with regard to scheduling a time for a closing of title to the Property. Mr. Glick again referred them to G Squared's separate real estate counsel. See Glick Decl., p.6, ¶18. (Dock. No. 297). In a second call that day, Mr. Glick was stunned when advised by the Trustee's office that the Trustee intended to schedule the closing on one business's notice day after the Bankruptcy Court's entry of the Sale Order. Glick Decl., ¶19. Noting that the Sale Order had not yet been

entered, Mr. Glick requested that the time to close be extended, asserting that it was plainly unreasonable to expect G Squared to coordinate a closing on one business day's notice under the circumstances. See Glick Decl., ¶20. When Mr. Glick asked why the Trustee was unwilling to schedule the closing for a later date, the Trustee's counsel stated that the Trustee was concerned that the Debtor's principal owner, Mr. Bildirici might file an appeal, and obtain a stay of the Sale Order. Glick Decl., ¶21. This contradicted the statement by Trustee's counsel to the Bankruptcy Court on the prior day that the Debtor supported the sale. See 8/8/07 Trans. p. 48, line 23, p.49, lines 13-25 (Ex. B to Dock. No. 297).

As a purported accommodation, the Trustee's office advised Mr. Glick that the Trustee would be prepared to adjourn the closing for three business days, time of the essence, if G Squared (i) deposited an additional non-refundable $500,000 with the Trustee, and (ii) agreed to release the entire deposit sum of $2.17 million from escrow if the closing did not then occur. See Glick Decl., ¶20 (Dock. No. 297).

Later in the afternoon on August 9, the Bankruptcy Court entered an order approving the sale of the Ground Lease to G Squared (the "Sale Order")(Ex. B to Dock. No. 289). The Bankruptcy Court had made numerous revisions to the form of order submitted by the Trustee, and it took additional time before a copy of the order showing the marked changes was delivered to Mr. Glick. Glick Decl., ¶22 Mr. Glick attempted to convince the Trustee's counsel that scheduling a closing on one business days' notice under the circumstances was unreasonable and unnecessary.

On August 10, not having received a written notice scheduling the closing, as was mandated under the Sale Agreement, Mr. Glick telephoned the Trustee's office to discuss the Trustee's apparent change of intent. Glick Decl., ¶24. But Mr. Glick was advised that a closing

had, in fact, been scheduled by the Trustee to take place on Monday morning, August 13.  Mr. Glick did not receive the written notice of closing required under the Sale Agreement until August 15, 2007, because that notice had been <u>delivered incorrectly</u> by the Trustee's overnight courier service to a person unknown to Mr. Glick who was employed by a different firm located in a neighboring suite unaffiliated with Mr. Glick's law practice.  Glick Decl., ¶25.  Mr. Glick asked that the notice be re-sent.  In response, he received an incomplete electronic copy of the closing notice, which did not include the exhibit referenced therein.  Glick Decl., ¶24.

The closing notice stated that the closing would be held on the next business day, Monday, August 13, 2007 at 10:00 a.m., at the offices of the Trustee's real estate attorneys.  The closing notice did not identify the adjustments to be made at closing, nor did it include copies of documents that the Trustee intended to deliver at closing, nor had the Trustee's side ever previously exchanged documents to be delivered at closing.  <u>See</u> Glick Decl., ¶¶ 24-26.

On Monday, August 13, 2007, at 10:00 a.m., the Appellants together with Mr. Glick appeared at the offices of the Trustee's real estate counsel.  At the meeting, Mr. Glick, requested that the closing date be extended, stating orally and in writing that G Squared while willing and able to close, required 15 business days before it would be ready to close.  Glick Decl., ¶27.  In response, the Trustee further increased his price for an extension:  His counsel stated that the Trustee would be prepared to adjourn the closing to September 5, 2007 if G Squared (a) immediately deposited an additional non-refundable $830,000 with the Trustee, (b) permitted the entire (augmented) deposit of $2.5 million to be released from escrow, and (c) waived any right to the augmented deposit in the event that G Squared did not close on September 5, 2007.  <u>See</u> Statement on the Record dated August 13, 2007, p.15, line 17 through page 23, line 9 (Ex. G to Dock. No. 289); Glick Decl., ¶29.

11

The Trustee's counsel then purported to conduct a "unilateral closing" before a court reporter, referring to numerous documents prepared by the Trustee's counsel for the closing which had never before been shared with G Squared or its counsel, and then declared G Squared to be in default. (Ex. G to Dock. No. 289, p.8, line 21 through p. 14, line 19). Mr. Glick stated on the record G Squared's request for a reasonable adjournment of the closing. Glick Decl., ¶30. The "closing" was then concluded.

**E.    The Trustee Negotiates Terms of a Closing with G Squared Without Disclosing His Prior Agreement to Allow Global to Close On or Before October 11, 2007**

On August 14, the Appellants engaged Joshua J. Angel to serve as co-counsel in the matter. On August 15, the Trustee sent a letter to his own law firm, Kittay & Gershfeld, P.C., demanding the release of the G Squared Deposit from escrow. By letter dated August 15, Mr. Glick responded to that demand objecting to the release of the deposit. Glick Decl., ¶32 and Ex. D thereto.

On August 16, Mr. Angel met with the Trustee's real estate counsel Ron Sernau and Adam Berkowitz. Following a wide-ranging discussion, a general understanding was reached, subject to client approval on both sides, that G Squared would continue to search for the funds needed to close on its purchase, and would otherwise settle with the Trustee under certain terms. See Affidavit of Joshua J. Angel, Esq. dated September 6, 2007 (the "Angel Aff."), ¶¶3-4 (Dock. No. 298). It was agreed that Mr. Berkowitz would draft a proposed stipulation of settlement (the "Stipulation") for review by Mr. Angel and Appellants. Angel Aff., ¶5.

There were no further conversations until Mr. Angel called Mr. Berkowitz on August 21 to inquire about the status of the draft Stipulation. In that call, Mr. Angel advised Mr. Berkowitz that the Appellants believed that they had lined up an investor who would partner with them to close on their purchase. Angel Aff., ¶5. He advised Mr. Berkowitz that he would call him by

12

2:00 p.m. that day to discuss the matter further.  Mr. Berkowitz responded that he would continue to work on the draft Stipulation, and he seemed pleased with the update that Mr. Angel had provided.  See Angel Aff., ¶¶ 2-5 and 7.  (Dock. No. 298).

Significantly, Mr. Berkowitz did not advise Mr. Angel that the Trustee had already entered into a secret letter agreement dated August 17, 2007[1] (the "Letter Agreement") with Global providing for the sale of the Ground Lease to Global as the backup bidder, and had agreed therein that Global would have until October 11, 2007--almost two months--to close. (the "Backup Extension").  The undisclosed Letter Agreement required Global to pay an additional deposit of only $80,000 by August 24 for the Backup Extension, and Global agreed to allow its expanded deposit to be released from escrow.  See Letter Agreement (Ex. H to Docket No. 289). See also Angel Aff., ¶ 14.

At approximately 2:00 p.m. on August 21, Mr. Angel telephoned Mr. Berkowitz, and advised him that the Appellants would close on their purchase by the end of the following week (i.e. August 30 or 31).  Angel Aff., ¶7.  Mr. Berkowitz stated that he did not think that would be possible because the Trustee "may have" made a deal with the Backup Bidder, and that he would have to consult with the Trustee.  Mr. Berkowitz telephoned Mr. Angel later that day, and represented that the Trustee would give G Squared until the end of the following week (i.e. August 31) to close, provided G Squared agreed to reimburse the Debtor's estate for the added costs it had incurred by not closing since August 13, but the Trustee would not allow G Squared to close the transaction together with a partner. Angel Aff., ¶7.  A conference call (the "Conference Call") between and among himself, the Trustee's general counsel (Judith Siegel, Esq. of the law firm of Kittay & Gershfeld, P.C.), Paul Rubin (a partner at Herrick Feinstein,

---

[1] The Trustee's counsel later stated that the document was executed on August 20, not August 17, though this inconsistency is immaterial.

13

LLP), and Mr. Angel was arranged for later that same day to discuss why the Trustee would not consent to G Squared closing on its purchase with a partner.[2]

In the August 21 Conference Call, Ms. Siegel reiterated that the Trustee was willing to close with G Squared, provided that the closing took place by the end of the following week (i.e. August 31st), and the Debtor's estate was made whole and reimbursed for the costs incurred by it since August 13, 2007. Angel Aff., ¶8. The Trustee's counsel remained adamant that G Squared would not be permitted to close with a partner. Angel Aff., ¶8. Ms. Siegel said that other bidders were not permitted to partner with investors, so inclusion of a partner with G Squared would taint the process. She quoted former Bankruptcy Judge Ryan as saying that "**Bankruptcy must not only be fair, it must appear to be fair**." Angel Aff., ¶8 (emphasis added).

On Wednesday, August 22, 2007, Mr. Berkowitz sent Mr. Angel a draft Stipulation, and by the late afternoon of the same day, Mr. Angel forwarded to Mr. Berkowitz and Ms. Siegel the Stipulation with his comments in clean and blacklined versions. Angel Aff., ¶10. Mr. Angel's comments (Enclosure to Dock. No. 315) included an extension to August 31 of G Squared's time to close and G Squared's responsibility to cover the expense to the Debtor's estate emanating from the delay in closing, and did not require that G Squared be permitted to close together with a partner. In short, G Squared clearly and unconditionally capitulated to the conditions for closing insisted upon by the Trustee's counsel in the Conference Call on the previous day.

## F.    The Trustee Slams the Door Shut on G Squared

On August 23, Ms. Siegel called Mr. Angel and advised him that the Trustee would not close with G Squared under any circumstance. Later that day the Trustee filed a motion (the

---

[2] The Trustee enjoyed discretionary authority to allow G Squared to assign its rights under the Sale Agreement without the need for further court order. Sale Agreement, ¶ 16. (Ex. B to Dock. No. 289).

14

"Motion") seeking permission to release the G Squared Deposit from escrow to the Debtor's bankruptcy estate since G Squared did not close on its purchase on August 13, 2007. (Dock. No. 289)

The Motion disclosed for the first time that the Trustee had entered into the August 17 Letter Agreement with Global to close on the sale of the Ground Lease and to postpone the closing until October 11, 2007. The Motion did not disclose that, as late as August 21, counsel for the Trustee had continued negotiations with Appellants regarding the terms under which the Trustee would still proceed to close with G Squared. Two days before the Bankruptcy Court held a hearing on the Motion, Ms. Siegel and Mr. Berkowitz submitted affidavits denying that any such negotiations regarding a closing with G Squared had taken place. (Ex. A to Dock. No. 302 at ¶34; Dock. No. 304, ¶¶6-8).

## THE BANKRUPTCY COURT'S RULING

During the course of the September 12, 2007 hearing on the Motion, the Bankruptcy Court stated that it wanted to read the stipulation that was forwarded by the Trustee's counsel on August 22 and the comments thereto that Mr. Angel had submitted on the same day. 9/12/07 Trans., p.67, lines 13-18. (Dock. No. 322) Mr. Angel agreed to and did provide those documents to the Bankruptcy Court after the hearing. (Docket No. 315). Nevertheless, the Bankruptcy Court issued an oral ruling at the conclusion of the hearing granting the Motion, without waiting to consider the stipulation that Mr. Angel intended to submit, which documented G Squared's stated willingness to close without a partner by August 31.

The Bankruptcy Court acknowledged that this matter is not governed solely by applicable nonbankruptcy law, but that there exists what it called a "federal equitable gloss" on the conduct of sales taking place bankruptcy. 9/12/07 Trans., pp.78-79. (Dock. No. 322) The Bankruptcy

15

Court determined that the "real issue here" was whether it was reasonable for the Trustee to decide not to pursue a transaction with G Squared after August 13 whereby G Squared would be the primary bidder, if that meant risking losing Global as the backup bidder. Id., p.84, lines 2-7. The Bankruptcy Court held that it was reasonable and not extraordinary for the Trustee to conclude that he did not wish to continue to negotiate with G Squared regarding a revised closing date that would involve a third party investor, because there may have been objections by the Debtor's principal or others, and the backup bidder might be lost   Id., p.84, line 17 through p. 86, line 3. (That statement  made little sense, because Mr. Angel did not suggest a closing with G Squared involving a partner until the morning of August 21, which was after the Trustee had entered into the Letter Agreement with Global.  Angel Aff., ¶ 5).

The Bankruptcy Court concluded that the Trustee's discussions with Mr. Angel after August 13 did not rise to the level of "fraud, mistake or like infirmity" tainting the process, and that it was appropriate for the Trustee to proceed with Global, given G Squared's failure to close on just one business day's notice. Id., p.86, line 19 through p.87, line 6.

## ARGUMENT

### POINT I

**The Motion Should Have Been Denied Because the Trustee
Did Not Have Discretion to Discriminate Unfairly Against G Squared**

A.    **The Trustee Had a Duty to Treat All Bidders Fairly,
Without Favoring One Bidder Over Another, and to
Exercise His Discretion in a Non-Arbitrary Manner**

It is well-established that a trustee appointed by a court in a reorganization proceeding is a fiduciary who has an obligation to treat all interested parties fairly. Citibank, N.A. v. Andros, 666 F.2d 1192, 1194 (8th Cir. 1981); In re Moulded Products, Inc., 474 F.2d 220, 224 (8th Cir. 1973); In re O.P.M. Leasing Services, Inc., 13 B.R. 64, 69 (S.D.N.Y. 1981). Cf. In re Bowman,

181 B.R. 836, 843, (Bankr. D.Md. 1995)(Fiduciary duties of a trustee or debtor-in-possession include a duty of impartiality).

The Trustee had a separate duty under New York law to exercise his discretion under the Sale Agreement rationally and in a non-arbitrary manner. The Sale Agreement is governed by New York law. Sale Agreement at ¶ 24. It is well-settled under New York law that "implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." Dalton v. Educational Testing Serv., 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 979 (1995). The covenant of good faith and fair dealing extends to a party's exercise of discretion under an agreement. As the New York Court of Appeals stated in Dalton:

> Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion.

Id., 639 N.Y.S.2d at 979-80; see also Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1575 (2d Cir. 1994)("Even when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith").

**B.     The Bankruptcy Court Failed to Recognize That Unfairness Toward Bidders Constitutes Grounds to Deny the Trustee's Motion**

The Bankruptcy Court stated that it should only grant equitable relief of returning a down payment to a bidder such as G Squared if there were "fundamental errors or compelling equities arising out of . . . fraud, mistake or like infirmity." (Dock. No. 322 at 80, lines 15 to 19). But it failed to recognize that unfairness toward bidders is such a fundamental error. The Bankruptcy Court relied on the decision in In re Target Two Assocs., L.P., 2006 WL 3068668, *06 (S.D.N.Y. Oct. 27, 2006)("Target II") where the Court stated: "Equitable considerations that courts have acknowledged might compel modification of an order confirming a sale in order to

17

permit a defaulting buyer to recover its deposit are limited to 'fundamental errors or compelling equities arising out of fraud, mistake or like infirmity.' For this proposition, the Target II court relied on the holding of the court in In re Frankel, 191 B.R. 564, 573 (Bankr. S.D.N.Y. 1995). The Frankel court stated that: "Only fundamental errors or compelling equities arising out of fraud, mistake or like infirmity, such as defective notice to interested parties of the sale or "grossly inadequate" sale price, justify setting aside a confirmed sale. See matter of Chung King Inc., supra, 753 F.2d at 550-552." In fact, the Frankel court **truncated** and thus misstated the relevant point of law enunciated by the Seventh Circuit in Chung King. There, the Seventh Circuit actually stated:

> It is not clear from the case law precisely what type of magnitude of "fraud mistake or * * * infirmity" justifies the setting aside of a judicial sale in bankruptcy. By far, the most frequent mistake or infirmity held to warrant vacating a confirmed sale is defective notice to interested parties of the judicial sale. [citations omitted]. Other objections deemed sufficient to defeat confirmation, though more isolated in frequency, involve further irregularities in the judicial sale proceedings themselves **such as unfairness toward bidders**, stifling of competition, inaccurate or otherwise insufficient advertisement, sham bidding, or 'puffing," . . . .

In re Chung King, Inc., 753 F.2d 547, 551 (7th Cir. 1985)(emphasis added).

Other federal appellate courts have also recognized that unfairness toward bidders is a wrong that is sufficient to warrant vacating a bankruptcy court's order regarding an auction sale. See M.R.R. Traders, Inc. v. Cave Atlantique, Inc., 788 F.2d 816, 818 (1st Cir. 1986); In re Stanley Engineering Corp., 164 F.2d 316, 318 (3rd Cir. 1947), cert. denied, 332 U.S. 847 (1948). Hence, the Bankruptcy Court mistakenly believed it needed to see something akin to a fraud in order to order a return of G Squared's deposit, whereas the case law actually instructs that unfairness toward bidders is sufficient. This led to reversible error by the Bankruptcy Court.

**C.    The Trustee's Harsh and Unfair Treatment of G Squared**
**Warranted Denial of the Motion Under the Circumstances**

The unfairness here is manifest.  The Sale Agreement between the Trustee and G Squared

provides that the "Seller may, in his sole discretion, but is in no way required to, agree to adjourn

the Closing at the request of Purchaser."  Sale Agreement, ¶ 3. (Ex. B to Dock. No. 289). In

exercising his discretion, the Trustee did not have the absolute right to discriminate between

bidders[3], to provide irrational justifications, to fail to disclose the true facts and his intentions, or

to proceed in a commercially unreasonable manner.

To require G Squared to close on one business days' notice, but to allow Global nearly

two months to close rather than hold Global to the very same contractual term contained in both

parties' contracts, represents unfair and disparate treatment.  Similarly, the Trustee demanded on

August 10 that G Squared make an additional immediate payment of $500,000 to obtain a three

business day extension of the closing date (Glick Decl., ¶¶ 20, 29),  On August 13, he offered

Appellants a fifteen business day adjournment in return for an increased deposit of $830,000.  In

contrast, on August 17, the Trustee granted Global an extension nearly three times as long in

return for an increased deposit of only $80,000, payable in one week's time.  This is unfair

discrimination.

The Trustee's failure to disclose his true intentions and the true state of facts was also

unfair.  The Trustee did not disclose in court on August 8 that he intended--out of the blue--to

send a closing notice the very next day scheduling an immediate closing.  His conduct is all the

more perplexing given the revelations by his counsel that they knew all along that, because of the

travel schedules of Global's personnel, if Global did not close "by the middle of August," it

---

[3] In contrast, the August 17 Letter Agreement provided that the Trustee had the sole **and**
**absolute**  discretion to extend the closing date beyond October 11, 2007.  (Ex. H to Dock. No.
289, p.2, top paragraph).

would not close "until sometime in September or October." Ex. A to Dock. No. 302 at ¶ 30; see also 9/12/07 Trans. p.59, lines 1-5 (Dock. No. 322). There was no emergency requiring the Trustee to put Appellants' feet to the fire. To be fair, the Trustee should have either (i) agreed to allow G Squared the short adjournment it requested, and still close with Global if G Squared failed to close, or (ii) required Global to close on one business days' notice as well.

It was also unfair of the Trustee's attorneys to negotiate with G Squared's counsel on August 21, 2007 regarding the terms for a closing with G Squared by the end of the following week, without disclosing that the Trustee had already signed his August 17, 2007 Letter Agreement with Global. It is ironic that counsel to the Trustee said to Mr. Angel, "Bankruptcy must not only be fair, it must appear to be fair." Angel Aff. at ¶ 8. By negotiating terms of a potential settlement that he had no intention of entering into, the Trustee crossed a red line, overstepping generally-accepted notions of good faith and fundamental fairness. Such conduct by an estate fiduciary should not be tolerated.

The Trustee's irrational justifications for his actions also highlight his unfair treatment of Appellants. The Trustee's original stated ground for insisting upon an expedited closing--that the Debtor's principal owner might seek a stay pending appeal--did not explain why the Trustee demanded an extra $500,000 for an adjournment of only 3 business days. Presumably, the very appeal which the Trustee was supposedly concerned about could easily have been filed within those same three days. The concern regarding such an appeal also made no sense since the Debtor did not object to the sale to G Squared. The pretext is and was apparent.

The Trustee's later claim that he needed "finality"--after he had already been advised that Global could not close for another one to two months--was another false pretext. It would have been logical for the Trustee to put Global on notice that, if G Squared did not close within the

fifteen business days it was requesting, the Trustee would expect Global to close shortly thereafter. Alternatively, the Trustee could have demanded that Global appoint attorneys-in-fact to execute documents for a closing to take place on one business day's notice after the Trustee declared G Squared to be in default. Instead, the Trustee sprung a one day closing notice on G Squared, declared G Squared in default so that its deposit would be subject to forfeiture, and then concluded that the need for finality had instantly disappeared, and readily agreed to give Global an additional seven weeks to close. The Trustee's conduct leaves the distinct impression that he was not truly interested in closing with G Squared, but wanted to favor Global.

The Trustee also proceeded in a commercially unreasonable manner. To decide to proceed with such a closing before the Sale Order was even entered was improper. Moreover, the scheduling of a closing for the sale of a commercial ground lease on one business day after the entry of the Sale Order, without any coordination among the closing professionals, and without any prior exchange of documents, was patently unreasonable.

## POINT II

### The Bankruptcy Court Erred Because Equity Abhors a Forfeiture and The Estate Was Not Entitled To An Unjust Windfall

**A.  There Are Important Equitable Principles to Which the Bankruptcy Court Failed to Afford Due Consideration**

It is axiomatic that equity abhors a forfeiture, and will avoid an unjust windfall. In re Target Two Assocs., L.P., 2005 WL 1140538 (S.D.N.Y. May 16, 2005)(Scheindlin, J.)("Target I"); see also In re Gordon Car and Truck Rental, Inc., 59 B.R. 956, 959 (Bankr. N.D.N.Y. 1985)("[T]he law is well settled that equity abhors forfeitures."); 151 W. Assoc. v. Printsiples, 92 A.D.2d 76, 80, 459 N.Y.S.2d 605 (1st Dep't 1983)(same). Based on these equitable principles, the Court in Target I remanded a somewhat similarly factual case so that the Bankruptcy Court could explain its consideration of these principles.

21

There, an auction for certain real property was conducted on April 22, 2004. The successful bidder put down a $1,000,000 deposit, but was unable to close on the $11.8 million purchase by the June 1, 2004 deadline. After receiving a 30-day extension in return for an $88,500 extension fee, the successful bidder informed the escrow agent on June 30, 2004 that it was still unable to close. Bankruptcy Judge Blackshear subsequently granted a motion authorizing the release of the deposit from escrow to the debtor's estate.[4]

On appeal, the Court reversed the ruling of the bankruptcy court and remanded the case for further clarification. Significantly, the Court observed that enforcing the forfeiture provision would result in a substantial windfall to the debtor's bankruptcy estate, which it described as "problematic." Target I, 2005 WL 1140538, *04. The Court held that the appellant's "argument sounding in equity should not be lightly dismissed" and it required an explanation from the bankruptcy court as to why principles of equity did not warrant a refund of some portion of the deposit. Here, the Bankruptcy Court erred by conferring an unwarranted and undeserved windfall upon the Debtor's estate, without adequately considering or explaining the factual predicate that could justify conferring such a windfall in this case.

## B.    Consideration of the Target II Decision Also Supports Reversal

On remand in the Target case[5], Bankruptcy Judge Peck concluded that the successful bidder had acted less than vigorously than he believed was required under the circumstances. Notably, he also concluded that if the deposit were retained by the estate, the funds would pass to

---

[4] This case differs from Target because, among other things, G Squared did not concede an inability to close after having been afforded nine weeks to do so, G Squared was not afforded a fair opportunity to close, and the debtor/seller in Target did not engage in unfair practices against the successful bidder or apply the bidding procedures unevenly.

[5] The information provided here is taken from the Target II decision.

unsecured creditors, who would then receive distributions in that case of approximately forty-six cents on the dollar, whereas their distributions were expected to drop to only fourteen cents on the dollar if the estate were required to refund the deposit. Target II, 2006 WL 3068668, *4

In weighing the equities, Judge Peck considered the loss to the successful bidder and its principals, and their good faith efforts to close, against the loss to unsecured creditors, and the successful bidder's knowing assumption of risk. Under the circumstances, Judge Peck found that enforcement of the forfeiture order was not inequitable to the successful bidder.

On appeal, the Court affirmed. The Court noted that "it is axiomatic that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process" Id., 2006 WL 3068668, *5, The Court also noted that such equitable powers may not be used to contravene the provisions of the Bankruptcy Code, but it did not identify any provision of the Bankruptcy Code that would be violated if a court were to permit a successful bidder to recover its good faith down payment if it has been treated unfairly.

Though the Target II court noted the federal interest in enforcing the finality of bankruptcy sales, it did not state that this interest permits bankruptcy trustees to breach their duties of fairness and impartiality, or to exercise their discretion in a discriminatory manner so as to favor one bidder over another.

The Target II court concluded that the successful bidder, as winner of the auction in that case, essentially obtained a valuable exclusive option to purchase the property during the entire period from April 22, 2004 to June 30, 2004. Since eight other bidders had each deposited $1 million signified that the option was marketable, and that the amount of the successful bidder's deposit in that case, $1,088,500 was not disproportionate to the option's value. The successful

bidder in <u>Target</u> made a business decision to "ride the risk" and forego opportunities to partner together with other bidders or persons in order to be able to close. <u>Id.</u>, 2006 WL 3068668, *6.

Here, in contrast, no other bidder appeared besides Global, and G Squared was afforded only one business day--not nine weeks--in which to close. In addition, the Trustee adamantly refused, despite repeated requests from G Squared, to permit G Squared to close with a partner. Thus, G Squared cannot be said to have acquired and squandered a valuable option.

The Bankruptcy Court failed to address whether, or explain why, in light of the Trustee's grossly disparate treatment, the Debtor's estate should receive an unjust windfall and retain any portion of G Squared's $1.67 million deposit. The Trustee was holding a contract to sell the Ground Lease to Global for $16.2 million, he was holding a deposit from Global in the amount of at least $1.62 million, and Global would have been entitled to a breakup fee in the amount of $300,000 if the Trustee closed with G Squared. The Trustee forecasted losses of only $439,000 from G Square's alleged breach (Docket No. 302, ¶23), which Appellants believe were inflated. Meanwhile, the Debtor's estate also had the ability to benefit from the profits which continued to be generated by the subject building during the period from August 13, 2007 to the date an actual closing would take place. To address Appellants equitable arguments properly, the Bankruptcy Court should at least have waited to see if Global closed (Appellants understand Global has closed on the purchase), and to evaluate the actual losses of the estate, if any.

Oddly, the Bankruptcy Court acknowledged that the Debtor's creditors are expected to be paid in full, so the benefit from retaining G Squared's deposit would flow to the equity holders. But the Bankruptcy Court dismissed this distinction from <u>Target</u> simply because the equityholders here did not participate in the process here. (Dock. No. 322, p. 87, line 24 to p. 88,

line 17.)  Appellants submit that inaction of equityholders does not entitle them to enjoy a windfall where a Appellants have been treated unfairly.

Whether the Debtor's estate was receiving an undeserved windfall, and balancing the harm to G Squared against the policies supposedly being protected, simply did not receive the careful examination required for the Bankruptcy Court to determine whether G Squared should forfeit its entire $1.7 million deposit.  The Bankruptcy Court abused its discretion because it failed to weigh the harm to G Squared against the benefit to the Debtor's estate.

## CONCLUSION

The federal courts have long been concerned with the integrity of the bankruptcy sale process. In re Wingspread Corporation, 92 B.R. 87, 92 (Bankr. S.D.N.Y. 1988). Where that integrity has been impugned, the bankruptcy courts may set aside their own orders pursuant to equitable principles. See id. at 92-93.  Bidders at bankruptcy auction sales have a reasonable expectation that the rules will be applied evenly and fairly to all who participate.  The Bankruptcy Court's Order should be reversed because the rules were not applied evenly and fairly in this case.

Dated: New York, New York
       November 13, 2007

HERRICK FEINSTEIN LLP

By: _____
Paul Rubin (PR-2097)
Joshua J. Angel (JA-3288)
2 Park Avenue
New York, NY 10016
Tel: 212-592-1400

Larry I. Glick, P.C.
Larry I. Glick, Esq.
1305 Franklin Avenue
Garden City, NY  11530
Tel:  516-739-1111

25

## CERTIFICATE OF SERVICE

I, Paul Rubin, a member of the law firm of Herrick, Feinstein LLP and duly admitted to practice before the United States District Court for the Southern District of New York, do hereby certify that I caused a true and correct copy of the Brief of Appellants G Squared Associates LLC, G Squared Management LLC, Allen Gutterman, and Mark Gutterman dated November 13, 2007 to be served on November 13, 2007 via electronic mail and via Federal Express for receipt on the next business day upon:

> Judith L. Siegel, Esq.
> Kittay & Gershfield
> 100 White Plains Raod
> Tarrytown, NY 10591
> Email: jsiegel@kittaylaw.com

Date:  New York, New York
      November 13, 2007

                                  Paul Rubin (PR-2097)