UNITED STATES DISTRICT COURT          **Document Electronically Filed**
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                              :
In re:                                        :        Chapter 11
                                              :
EAST 44TH REALTY, LLC,                        :        Case No. 05-16167 (RDD)
                                              :
                          Debtor.             :
-------------------------------------------------------X
G SQUARED ASSOCIATES LLC,                     :
G SQUARED MANAGEMENT, LLC,                    :
ALLEN GUTTERMAN, and                          :
MARK GUTTERMAN,                               :
                                              :
                  Appellants,                 :        Case No. 07-CV- 09565 (PAC)
                                              :
            against                           :        (Bankruptcy Appeal)
                                              :
DAVID R. KITTAY, as Chapter 11                :
Trustee of East 44th Realty, LLC,             :
                                              :
                  Appellee.                   :
-------------------------------------------------------X

## BRIEF OF DAVID R. KITTAY, CHAPTER 11 TRUSTEE
## FOR THE ESTATE OF EAST 44TH
## REALTY, LLC, IN OPPOSITION TO APPELLANT'S APPEAL

David R. Kittay (DK 0481)
Kittay & Gershfeld, P.C.
100 White Plains Road, 2nd Floor
New York, New York 10501
Telephone: (914) 332-8000
Facsimile: (914) 332-8001

Attorneys for the Appellee

## Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    The Trustee's Sale Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    The Bidding Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    Appellant Bids on the Lease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    The Auction Sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Applicable Terms of the G Squared Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    The Auction Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    The Trustee Notifies G Squared that He Intends to Close
        In Accordance with the Terms of the G Squared Contract . . . . . . . . . . . . . . . . 8

    An Expedited Closing In Accordance With the Terms
        of the G Squared Contract Was In the Estate's Best Interest . . . . . . . . . . . . . . . 8

    The Aborted Closing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    In Accordance with the Terms of the G Squared Contract
        and the Sale Order, the Trustee Proceeds To Close with Global . . . . . . . . . . . . 11

    The Trustee Attempts to Negotiate With Appellant About the Return of a
        Portion of Appellant's Deposit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    The Bankruptcy Court's Thorough and Well-Reasoned Decision . . . . . . . . . . . . . . 14

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I.   HAVING CORRECTLY APPLIED THE LAW
     IN THIS DISTRICT TO THE FACTS OF THIS CASE,
     THE BANKRUPTCY COURT'S DECISION MUST BE UPHELD  . . . . . . . . 17

II.  THE TRUSTEE'S CONDUCT WAS FAIR AND EQUITABLE
     AND THERE WAS NO FRAUD, MISTAKE OR
     INFIRMITY IN THE SALE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

     A.   The Trustee's Refusal to Extend the Time to Close Was Fair . . . . . . . . . 18

     B.   The Trustee Correctly Determined to Close with Global  . . . . . . . . . . . 22

     C.   Duty to Maximize the Return to the Estate  . . . . . . . . . . . . . . . . . . . . . . 22

     D.   The Trustee's Treatment of Global Was Fair Vis-a-Vis Appellant . . . . . 23

     E.   The Trustee's Negotiations With G Squared Were Fair  . . . . . . . . . . . . . 24

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## Table of Authorities

**Case Law**

*Caridi v. Markey,* 539 N.Y.S.2d 404, 405 (2d Dep't 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Collard v. Village of Flower Hill,* 52 N.Y.2d 594, 439 N.Y.S.2d 326 (1981) . . . . . . . . . . . . . 19

*Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 390 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Grace v. Nappa*, 46 N.Y.2d 560, 565 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

*Greenbaum v. Weinstein*, 131 A.D.2d 430, 431 (App. Div. 2d Dep't June 1, 1987) . . . . . . . . . 21

*Keeney v. Kemper Nat'l Ins. Co.*, 960 F. Supp. 617, 624 (E.D.N.Y. 1997) . . . . . . . . . . . . . . . 20

*Mann Theaters Corp. v. Mid-Island Shopping Plaza, Co.,* 464 N.Y.S.2d 793, 797-98
(2d Dep't 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*New York Property Holding Corp. v. District 65, et al. (In re District 65, et al.)*,
206 B.R. 676  (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 18, 20

*W.W.W. Assoc., Inc. v. Giancontieri*, 77 N.Y.2d 157 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Bowman*, 181 B.R. 836 (Bankr. D. Md. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Farmland Indus., Inc.*, 284 B.R. 111 (Bankr. W.D. Mo. 2002) . . . . . . . . . . . . . . . . . . . . . 21

*In re Miami General Hospital, Inc.*, 81 B.R. 682 (S.D. Fla. 1988) . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Rapier Sugar Feed Co.,* 13 F. Supp. 85 (D. Ct. W.D. Ky 1935) . . . . . . . . . . . . . . . . . . . . 21

*In re Target Two Associates, L.P.*, 2006 WL 3068668 (S.D.N.Y. Oct. 27, 2006). . . . . . 15, 17, 18


**Statutory Authority**

11 U.S.C. § 365 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

Federal Rule of Bankruptcy Procedure 6006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Federal Rule of Bankruptcy Procedure 8013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16

## STATEMENT OF THE CASE

Appellant perpetrated a fraud on the Bankruptcy Court and on the Trustee when it: (a) advised the Trustee that it had the necessary financing to close on the Trustee's sale of the Debtor's sole asset, but did not; (b) agreed to the terms of and bid pursuant to the bidding procedures, not intending to abide thereby; (c) executed a contract that included an explicit, strict, one-day closing requirement knowing it could not close within one day; and (d) participated in the sale hearing and allowed the Bankruptcy Court to approve the sale to Appellant in accordance with the bidding procedures and codify the closing requirement and the forfeiture provision in its order, knowing it could not, or would not, comply with either.

Having mocked the Court and the sale procedure, Appellant now has the chutzpah to argue that the Trustee's good faith attempts to consensually negotiate a return of a portion of Appellant's down payment, rejected by Appellant, somehow waived the explicit provisions of the contract and the Bankruptcy Court's order.

Overturning the Bankruptcy Court's order and rewarding Appellant's behavior would be contrary to the express terms of the bidding procedures, the contract and the Bankruptcy Court's order, contrary to the laws of New York State and inequitable and unfair to the Debtor's creditors who have borne the cost of the delay occasioned by Appellant's default.

As this Court stated in *New York Property Holding Corp. v. District 65, et al.*, 206 B.R. 676 (S.D.N.Y. 1997):

> The various arguments raised by the Appellant are truly not about the actions of the Debtor or the decision of the Bankruptcy Court, but are really complaints against the bargain which the Purchaser made. *Having made just that bargain, the Purchaser has no right to ask to be relieved of it merely because its unreasonable expectations were unfulfilled.*

*Id.* at 680 (emphasis added).

## STATEMENT OF THE ISSUE

Was the Bankruptcy Court's decision that the bidding procedures, the contract terms, the Bankruptcy Court's order approving the sale and New York law required the forfeiture of the down payment, made after a thorough review of the factual record, clearly erroneous under Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 8013?

## STANDARD OF REVIEW

Bankruptcy Rule 8013 provides in salient part: "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous ...". Fed. R. Bankr. Pro. 8013. Here, the Bankruptcy Court's reasoned decision was based on a factual record which was "fairly lengthy", included the underlying documents, was briefed "quite thoroughly and adequately" and was supported by representations of "very capable counsel" in the course of approximately three hours of oral argument. *Transcript of September 12, 2007 Hearing*, p. 4, lines 9-12 (hereinafter cited as "*Tr.*, p. _, line(s) __"). Appellant's counsel was offered and explicitly waived the opportunity to call witnesses to rebut the facts set forth in the Trustee's pleadings and supporting affidavits. *Tr.*, p. 4, lines 5-25. Moreover, the Bankruptcy Court was intimately familiar not only with the instant factual record, but with this complex bankruptcy case as a whole. In these circumstances, the Court must apply a "clearly erroneous" standard when reviewing Appellant's appeal and afford the Bankruptcy Court considerable deference.

## STATEMENT OF FACTS

On August 5, 2005, the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). On February 14, 2007, the Bankruptcy Court

appointed David Kittay (the "Trustee") as the Debtor's Chapter 11 Trustee to resolve years of rancorous litigation and determine if the Debtor's sole asset could be sold or if the case should be converted to a case under Chapter 7 of the Bankruptcy Code.

**The Trustee's Sale Motion**

The Trustee determined that the only way to create value for the Estate was to sell[1] the Debtor's sole asset, a ground lease (and related sub-leases[2]). *Response of the Chapter 11 Trustee to G Squared Management LLC and G Squared Associates LLC's Objection to Motion to Release Funds from Escrow* (hereinafter referred to as the "*Response*"), Exhibit A (hereinafter cited to as the "*Siegel Aff.*"), ¶4.

The Trustee solicited stalking horse bids, determined that the $16.2 million bid by Global Capital Holding LLC ("Global") was the highest and best offer and entered into a sale purchase agreement (the "Global Contract") with Global, subject to higher and better offers and Bankruptcy Court approval.

Cognizant of the fact that the Debtor's principal, Joseph Bildirici, objected to the Trustee's sale of the Lease and that the Debtor's landlord[3] (the "Landlord") was also threatening to oppose the sale, and with the hopes of forestalling any appeal of the sale, the Trustee specifically drafted language in the Global Contract that required Global, or the ultimately successful purchaser, to close

---

[1]    Solely for purposes of these pleadings, the Trustee uses the words "sell" or "sale" when referring to the disposition of the Debtor's asset.  Pursuant to Bankruptcy Code Section 365, the Trustee was assuming and assigning the asset to Appellant.

[2]    The ground lease and sub-leases are hereinafter referred to collectively as the "Lease".

[3]    The landlord had consistently taken the position that the Lease terminated in Spring 2005.

3

on one business-day's notice and that stated that time was of the essence. *Tr.*, p. 5, lines 8-12; p. 59, lines 4-15 (hereinafter cited as "*Tr.*, p. _, line(s) __").

On June 14, 2007, the Trustee filed a motion seeking approval of a two-part sale process pursuant to which he would first obtain approval of the proposed bidding procedures and then, after obtaining approval, would solicit higher and better offers for the Lease, conduct an auction of the Lease and then obtain Bankruptcy Court approval of the highest and best bid for the Lease. *Siegel Aff.*, ¶5.

**The Bidding Procedures**

By Order of the Bankruptcy Court dated July 13, 2007, the Bankruptcy Court approved the bidding procedures (the "Bidding Procedures") for the sale of the Lease. *Id.*, ¶6. The Trustee directed his counsel to provide a packet of information, including a blank form of contract (the "Form of Contract") and a copy of the Bidding Procedures, to each potential purchaser so that each bidder would bid pursuant to the same terms and on a level playing field. *Id.*, ¶7.

Section 1 of the Bidding Procedures established rules for the auction and stated that the Trustee would close with the second highest and best bidder if the highest and best bidder failed to close on the sale transaction:

> **Failure to Close on Sale Transaction; Retention of Deposits:** In the event that, for any reason, the Successful Bidder fails to close the Sale Transaction contemplated by its Successful Bid, then, without notice to any other party or further court order, the Trustee shall close with the Qualified Bidder that submitted the Next Highest Bid (defined below).

*Siegel Aff.*, Exhibit A, ¶(1) (Exhibit A to the Siegel Affidavit is hereinafter referred to as the "*Bid Pro., ¶_*"). *Bid Pro.*, ¶(1)(F).

Pursuant to Bankruptcy Code Section 365(b)(1), in order to assume and assign the Lease the

4

Trustee had to establish that the potential purchaser(s) could provide adequate assurance of future performance. Moreover, the Landlord's approval was critical because of his litigious nature and ability to oppose the sale. Accordingly, the Bidding Procedures required prospective purchasers to provide copies of financial documents and such additional assurances as the Trustee deemed necessary. *Bid Pro.,* ¶2A; *Tr.*, p. 55, lines 19-23.

Potential bidders were required to provide the Trustee with a 10% down payment with their bids. *Bid Pro.,* ¶2(E)(iv).

The Bidding Procedures required the successful bidder to close within one business day of receiving notice of entry of an order (the "Sale Order") approving the sale of the Lease (the "One Day Requirement") and stated that time was of the essence:

> The closing shall take place on the business day following notice of the entry of the Sale Order. Time is of the essence as to the Successful Bidder's obligations to close on such date. . . .

*Bid Pro.,* ¶6.

### Appellant Bids on the Lease

Appellant submitted its $16.7 million bid and the required 10% down payment (the "Down Payment") in accordance with the Bidding Procedures. *Declaration of Larry Glick*, dated September 6, 2007, ¶9 (hereinafter cited as "*Glick Dec.*, ¶__").

After reviewing the initial financial materials provided to him by G Squared, the Trustee arranged for Appellant to meet with the Landlord. At that meeting, counsel to the Trustee specifically asked Appellant if it had the financing available to purchase the Lease. *Siegel Aff.*, ¶12. Appellant said it did. *Id.* The Form of Contract provided to Appellant made clear that the sale of the Lease was an "all cash" transaction with no financing contingencies. *Tr.*, p. 33, lines 16-21; *Tr.*,

p. 84, lines 5-6.

Although the Landlord was concerned about Appellant's ability to manage the building, after consultation with the Trustee the Landlord acceded to Appellant's qualifications. After analyzing Appellant's financial information and Appellant's representation that it had financing to close on the transaction, the Trustee determined that Appellant was a qualified bidder. *Siegel Aff.*, ¶¶12-13.

Within two business days of receiving all the required information, the Trustee informed G Squared's self-described contact person, Marika Tolz, that Appellant was a qualified bidder. *Siegel Aff.*, ¶15.

**The Auction Sale**

On August 8, 2007, the Trustee conducted an auction of the Lease. Even though Appellant knew: (a) about the One Day Requirement and (b) that it did not have financing, Appellant bid on the Lease. Appellant was the winning bidder with its $16.7 million bid. Global was the only other bidder with its initial $16.2 million bid. *Id.*

Appellant was required to execute a contract identical in substance to the Form of Contract. *Bid Pro.,* ¶2(E)(ii). Prior to conforming the contract, Appellant's counsel asked for, and received, an opportunity to review the Form of Contract. *Siegel Aff.*, ¶17. After reviewing the contract, Appellant's counsel and the Trustee's counsel completed the blank portions of the contract (name of purchaser, purchase price and to whom notice was to be sent) and Appellant and its principals executed the contract (the "G Squared Contract"[4]). *Id.*, ¶¶16, 23.

---

[4]     The G Squared Contract is Exhibit B to the Trustee's Motion for an Order in Accordance with Court's August 9, 2007 Order Authorizing Release of Escrowed Funds (hereinafter referred to as the "*Motion*") and citations to the G Squared Contract will hereinafter be referred to as the "*G Squared Contract, §_*".

6

**Applicable Terms of the G Squared Contract**

    Appellant's closing obligations were clearly delineated:

    The consummation of the purchase and sale transaction contemplated hereby (the "Closing") shall take place at 10:00 A.M. on the next business day after notice of the entry of the Sale Order ...

*G Squared Contract*, §3; *Tr.,* p. 5, lines 8-12.

    The Trustee's remedies were delineated in paragraph 13 of the G Squared Contract:

    ... Seller's sole remedy shall be to . . . receive the Downpayment (and the interest earned thereon) from Escrow Agent, as liquidated damages and as Seller's sole and absolute remedy; . . .

*G Squared Contract*, §13. This language was codified in the Bankruptcy Court's Sale Order. *Motion,* Exhibit C, Order Authorizing Assumption, Assignment and Sale of Certain Unexpired Leases, pp.13-14, ¶29 ("Exhibit C is hereinafter cited as "*Sale Order,* ¶__") .

    The G Squared Contract could only be modified or amended in a writing signed by all parties. *G Squared Contract*, §19.

    The G Squared Contract expressly stated that Appellant's obligation to close was not subject to its ability to obtain financing: "Nothing contained in this Section 3 conditions Purchaser's obligations hereunder on Purchaser's arranging financing for all or any portion of the Purchase Price." *G Squared Contract*, §3.

**The Auction Hearing**

    As the Trustee would later find out, Appellant perpetrated a fraud on the Bankruptcy Court and the Trustee by: (a) accepting and bidding on the Lease in accordance with the Bidding Procedures; (b) executing the all-cash, no financing contingency G Squared Contract; (c) participating in the hearing at which the Bankruptcy Court discussed the waiver of the Bankruptcy

Rule 6006 stay[5]; and (d) letting the Bankruptcy Court enter the Sale Order, while knowing that it had

no financing and could not satisfy the One Day Requirement.  As stated by the Debtor's lender at

the hearing on the Motion (the "Hearing"), "if there was any sharp dealing here, that was it."  *Tr.*,

p. 65, lines 2-18.

At the auction hearing, Global was denied the return of its $1.62 million down payment.  *Tr.*,

p. 24, p. 25, lines 1-24; *Glick Dec.*, Exhibit B, p. 51, lines 3-5.  When asked by Global's counsel

when the closing would occur, the Trustee's counsel responded "promptly".  *Tr.*, p. 10, lines 12-20.

No specific date was provided.  *Siegel Aff.*, ¶18.  Appellant's counsel admitted that the Trustee never

deviated from the One Day Requirement.  *Tr.*, p. 24, lines 15-17; p. 25, lines 22-24.

**The Trustee Notifies G Squared that He Intends to Close
In Accordance with the Terms of the G Squared Contract**

In accordance with Section 15 of the G Squared Contract, the Trustee properly provided

notice to Appellant that the closing would take place at 10:00 a.m. on August 13, 2007.  *Motion*, ¶9;

*Tr.*, p. 83, lines 12-13 (Bankruptcy Court finds that "notice was provided properly here").

As a matter of professional courtesy, the Trustee had notified Appellant's attorney of the

closing one day earlier and personally "blacklined" the Sale Order to show the Bankruptcy Court's

changes to the proposed form of order and provided a copy to Appellant's counsel within hours of

its entry.  *Siegel Aff.*, ¶¶22-23.

**An Expedited Closing In Accordance With the Terms
of the G Squared Contract Was In the Estate's Best Interest**

The G Squared Contract specified an immediate closing because the Trustee intended to

---

[5]    Bankruptcy Rule 6006(d) states:  "An order authorizing the trustee to assign an executory contract or unexpired lease under §365(f) is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. Pro. 6006(d).

preclude an appeal of the sale. *Tr.*, p. 59, lines 4-15. Further impetus for an immediate closing was the Trustee's stipulation (the "Stipulation")[6] with the Landlord and the Debtor's bank which, by its terms, required a closing on or before October 15, 2007. *Letter from Larry Glick to David R. Kittay dated August 13, 2007*; *Tr.,* p. 31, lines 14-16. In addition, Global had already requested the return of its down payment. *Tr.,* p. 41, lines 24-25; *Glick Dec*., Exhibit B, p. 50, lines 16-25; p. 51, lines 1-5. Given the foregoing, failure to close immediately with Appellant presented the potential for real harm to the Estate. *Tr.*, p. 86, lines 12-15.

**The Aborted Closing**

On August 9th, immediately after being advised of the closing date, Appellant informed the Trustee that it was not prepared to close[7]. *Glick Dec*., ¶19.

Upon the advice of his real estate counsel, and in keeping with reasonable and customary business terms in New York real estate transactions, the Trustee offered to adjourn the closing for three business days in exchange for Appellant: (a) depositing an additional $500,000 down payment (not an extension fee) and (b) agreeing to the immediate release of the entire down payment to the Trustee. *Siegel Aff.*, ¶¶20-21. Fulfillment of these requirements would demonstrate Appellant's good faith intent to close on the sale. *Id.*, ¶20.

G Squared's counsel stated that its client could not afford to increase the Down Payment by the requested sum and ignored the Trustee's suggestion that it make a counter-proposal. *Tr.,* p. 32,

---

[6]    The tri-party Stipulation resolved a litany of problems between and among the parties including the keystone issue of the Lease's existence. Absent the Stipulation, the Trustee faced the very real risk that the Debtor's case would be converted to a case under Chapter 7 of the Bankruptcy Code.

[7]    As of the sale hearing, Appellant had not even ordered a title report on the Lease. *Tr.*, p. 11, lines 18-21.

lines 22-25; p. 33, lines 1-4.

On August 13, 2007, the Trustee attempted to close on the transaction by providing Appellant with all the required documents pursuant to Section 5 of the G Squared Contract. *Siegel Aff.*, ¶28; *G Squared Contrac*t, §5.

Appellant was unable to close and requested a 15 business day adjournment. *Tr.,* p. 30, lines 10-16; p. 20, lines 22-23. *Siegel Aff.*, ¶25; *Glick Dec.*, ¶27.

Appellant's failure to timely close on the sale constituted a default. *Siegel Aff.*, ¶25.

The Trustee was under no obligation to adjourn the closing. Rather, he was entitled, at his sole discretion, to adjourn the closing. *G Squared Contrac*t, §3; *Siegel Aff.,* ¶26. The Trustee proposed an extension of time (without requiring payment of an extension fee) in exchange for: (a) the immediate deposit of an additional $830,000 with the Trustee; (b) the release of the entire $2.5 million down payment and (c) a waiver of Appellant's right to any portion of the $2.5 million down payment if Appellant failed to close on or before September 5, 2007. *Tr.,* p. 71, lines 8-18; *Siegel Aff.*, ¶27; *Appellant's Brief*, p. 11; *Motion,* ¶11.

Instead, Appellant tendered a letter in which it wrongly asserted that it had not been provided with proper notice of the closing and claimed the right to the return of its Down Payment. *Motion*, ¶¶10, 12; *Glick Dec.*, ¶30.

Pursuant to the G Squared Contract, the Trustee's only remedy was the retention of the Down Payment. *G Squared Contract*, §13. On August 14, 2007, the Trustee served a demand notice on the escrow agent seeking the release of the Down Payment. *Motion*, ¶13.

10

**In Accordance with the Terms of the G Squared Contract
and the Sale Order, the Trustee Proceeds To Close with Global**

When he learned that G Squared, having signed the contract the day before, would not close, the Trustee was "flabbergasted". *Tr.,* p. 71, lines 11-12. After Appellant refused to negotiate an adjournment of the closing, the Trustee lost confidence in G Squared's good faith and determined, in his business judgment, that Appellant was either unwilling or unable to close. *Tr.,* p. 71, lines 12-14.

Paragraph 29 of the Sale Order provided that if G Squared failed to close, Global was obligated to close with the Trustee:

> In the event of the default of the Final Purchaser and failure to close in accordance with the Final Agreement and this Order, the Trustee is hereby authorized to close with Global Capital Holding LLC pursuant to the Second Highest Agreement and the Next Highest Bid. In such case, this Order and all of the terms and provisions herein shall apply to Global Capital Holding LLC, the Second Highest Agreement and the Next Highest Bid to the same extent they are to apply to Final Purchaser, the Final Agreement and the Successful Bid.

*Sale Order*, ¶29.

Accordingly, when Appellant defaulted, the Trustee notified Global of its obligation to close as the second highest and best bidder. *Motion*, ¶13, n. 3; *Siegel Aff.*, ¶29. The closing with Global required no additional approval from the Bankruptcy Court. *Tr.,* p. 49, lines 24-25; p. 50, lines 1-4.

Global's principals originally advised the Trustee that Global would close on the sale in mid-August or, due to previous commitments, not until late September or October. *Tr.,* p. 58, lines 24-25; p. 59, lines 1-3. When the Trustee's counsel contacted Global after Appellant's default, they learned that a closing could not occur until the Fall. *Siegel Aff.*, ¶30.

In order to extend the time to close, Global was told to increase its down payment by $500,000 and agree to the release of its down payment, as well as a waiver of any right to recover

11

the increased down payment.  *Siegel Aff.*, ¶31.  Global refused these terms.  After a series of

negotiations, Global agreed to increase its down payment by $80,000, release the full amount of its

down payment from escrow and waive all rights to recover any portion of its down payment if it

failed to close.  *Id.*  A letter embodying the parties' agreement was executed on August 20th (the

"*Global Letter*").  *Id.*; *Tr.*, p. 44, lines 5-7.

      The Trustee determined that the terms with Global, which varied from the terms proposed

to G Squared, were fair and reasonable given the fact that, given Appellant's extraordinary conduct,

Global was now the sole remaining bidder for the Lease, in effect, the Estate's last, best hope to pay

creditors and avoid a debacle.  In addition, Global had:  (a) negotiated with the Trustee; (b) agreed

to increase and then release the full down payment; and (c) waived all rights to recover its down

payment if it defaulted.  In contradistinction to Appellant, Global's good faith efforts and candor

about when it would be able to close, satisfied the Trustee that in fact it intended to close.  *Siegel

Aff.*, ¶¶30, 32.

**The Trustee Attempts to Negotiate With Appellant**
**About the Return of a Portion of Appellant's Deposit**

      On August 16, 2007, at the request of Appellant's counsel, the Trustee's counsel met with

Appellant to discuss a consensual resolution of the Down Payment dispute.  Affidavit of Adam T.

Berkowitz in Further Support of Motion to Release Deposit from Escrow, dated September 11, 2007,

¶4 (hereinafter cited as "*Berkowitz Aff.*, ¶__").  Although the Trustee was not obligated to return any

of the Down Payment, at Appellant's request the Trustee allowed his counsel to negotiate with

Appellant about a return of a portion of the Down Payment.  Appellant's assertion that the Trustee

agreed to let Appellant close on the transaction, and in effect, keep an "option" open to close with

Global, is contravened by the fact that the Trustee had executed the Global Letter prior to preparing

the stipulation (the "Down Payment Stipulation"). *Global Letter*; *Tr.*, p. 64, lines 2-13. Appellant's

assertion is further belied by the fact that pursuant to the express terms of the Down Payment

Stipulation drafted by the Trustee's counsel and the additional language (shown in bold) unilaterally

inserted by Appellant:

1. Upon the execution hereof, fifty percent (50%) of G Squared's Downpayment, which sum shall be equal to $835,000, plus any interest accrued thereon, (the "Released Downpayment"), shall be released from Escrow and, **subject to the terms below,** shall be released from Escrow and**, subject to the terms below,** shall be retained by the Trustee as liquidated damages for the benefit of the Estate....

2. The remaining fifty percent (50%) of G Squared's Downpayment, which sum shall be equal to $835,000, plus any interest accrued thereon (the "Remaining Escrow"), shall remain in Escrow pending ~~the~~ **a successful closing of the transaction contemplated by the [G Squared Contract] or a** successful closing of the transaction contemplated by the Stalking Horse Contract with Global Capital (the "Stalking Horse Closing").

   \*\*\*

4. If~~, however,~~ **G Squared does not close on or before August 31, 2007 and** the Stalking Horse Closing does not occur on or before ~~October 11, 2007 (unless such date is extended by the Trustee, in his sole and absolute discretion)~~**, September 20, 2007**, the Trustee shall provide G Squared with Notice of its intention to close on the original transaction contemplated by the [G Squared Contract] with G Squared, in accordance with the terms thereof. ... **it being agreed and understood that, notwithstanding anything to the contrary contained in the G Squared Contract or otherwise, if the Stalking Horse Closing does not take place on or before September 20, 2007, G Squared shall be permitted to acquire and take title to the Property together with one or more partners, joint venturers or co-investors of its choosing, provided that no such partner, joint venturer or con-investor is affiliated with either the Debtor or Global Capital.**

*Unsigned Blacklined Stipulation,* Docket No. 315, (blacklining in the original); *Siegel Aff.*, ¶34.

The Trustee did not (and would not) consent to allow Appellant to close with a new, third

party investor. In accordance with Bankruptcy Code Section 365, and the Landlord's explicit

requirement that it be a party to the vetting process, each potential purchaser had to be approved

13

prior to the bidding process.  *Tr.,* p. 84, lines 6-13.  These concerns were embodied in the G Squared

Contract which prohibited:  (a) Appellant's transfer of ownership interest in Appellant prior to the

closing and (b) the assignment of rights under the G Squared Contract without the Trustee's consent.

*G Squared Contract*, §16.

Second, an unknown purchaser would have violated the terms of the Bidding Procedures,

creating a situation which could have led to, at a minimum, an appeal of the Sale Order.  As

explained by the Bankruptcy Court:

> It seems to me that one of the reasons that the Trustee might have opposed going back to me on this issue involving a third party might be that that person would again file an objection and might appeal the sale, which would then put the matter in limbo and potentially let the backup bidder off the hook.

*Tr.*, p. 41, lines 19-24; *see also Tr.*, p. 84, lines 20-25; p. 85, lines 1-11.

As the Bankruptcy Court further opined:

> They would need to get court approval to do what your client proposed which was to bring a partner into the deal.  And if that approach - - wait, let me finish.  If that - - if they took that approach or if the Trustee took that approach wouldn't he run the risk of some party in this very contentious bankruptcy case objecting, appealing, and meanwhile the Trustee losing the backup bid because it's no longer properly closing.  It's - - you know, we're months out, then.

*Tr.*, p. 50, lines 2-10.

## The Bankruptcy Court's Thorough and Well-Reasoned Decision

At the conclusion of the hearing, the Bankruptcy Court rendered its decision[8].  The

Bankruptcy Court held that:

---

[8]     The Bankruptcy Court's failure to review the Down Payment Stipulation is immaterial because the Court, after hearing Appellant's interpretation of the Down Payment Stipulation, construed the Down Payment Stipulation in the light most favorable to Appellant and still found in favor of the Trustee.  *Tr.*, p. 86; p. 87, lines 1-8.

14

Under the law of New York it is clear to me based on the terms of the contract as well as the sale order, which are unambiguous and, therefore, clearly set forth the intention of the parties that (a) there was a breach; (b) the Trustee was not under an obligation to extend the time for the closing; (c) the good-faith deposit was an acceptable amount of liquidated damages and that courts in New York would enforce that provision under the circumstances notwithstanding that actual damages could be lower.

***

And I suppose that should be supplemented by the very clear law of New York that courts should not read into contracts particularly contracts documenting between sophisticated parties well represented by counsel pertaining to real estate transactions unstated provisions . . .

*Tr.*, p. 78, lines 7-15, 21-25.

The Bankruptcy Court noted, however, that while New York law is tempered by the so-called "equitable gloss" described by Judge Scheindlin in *Target Two Associates*[9], *Tr.*, p. 79, lines 2-9, this "gloss" is limited by the importance of enforcing finality of bankruptcy sales. Thus, a sale can only be undone if compelling equities such as fraud, mistake or infirmity are present. *Tr.*, p. 79, lines 14-25; p. 80, lines 1-16. The Bankruptcy Court also noted another policy limiting the equitable gloss: the Trustee's goal of maximizing the sale price. *Tr.*, p. 80, lines 18-21. This goal, the Bankruptcy Court explained, is facilitated by clearly articulated bidding procedures, such as the ones in the instant case, which were clear, true and approved by the Bankruptcy Court. *Tr.*, p. 80, lines 21-25.

The Bankruptcy Court explicitly questioned whether there was anything sufficiently inequitable or, in Judge Scheindlin's words, "extraordinary" in the Trustee's decision not to allow Appellant to bring in a third-party investor or continue negotiating with Appellant. *Tr.*, p. 83, lines 24-25; p. 84, lines 1-4.

The Bankruptcy Court stated:

Given those conditions, it seems to me reasonable and not extraordinary for the

---

[9]     *In re Target Two Assoc., L.P.*, 2006 WL 3068668 (S.D.N.Y. Oct. 27, 2006).

15

Trustee to conclude that he did not want to continue to negotiate over a revised closing date that would involve a significant investment by a new party, which I believe would have required obtaining court approval and opened up the bidding process to objection not only by Mr. Bildirici, but potentially by other bidders, at least under the <u>Paloian</u> case and otherwise.

The Trustee had a backup bidder in place, but there would be some limit to his ability to keep that bidder in place, I believe, given the colloquy on the record involving the backup bidder's counsel at the sale hearing as well as a general limitation of reasonableness on keeping the bidder in place, particularly given the potential change in the transaction involving a third party who would not have been part of the bidding process originally.

So in weighing an extension, the Trustee has to weigh the risk of ultimately losing not only the bidder, but also the backup bidder and losing the benefit of having a now final order approving the transaction, so I can understand and find reasonable the Trustee's decision not to pursue a transaction whereby G Squared would remain the primary bidder.

*Tr.*, p. 85, lines 4-25.

After weighing all the factors in this case, the Bankruptcy Court concluded:

The Trustee properly assessed the risk of proceeding with a purchaser that has already defaulted and acknowledged that it needed third-party financing to close, which not only presented a risk in and of itself but also presented it, in my view, a substantial risk that it would lose the backup there as against the backup bid and rightly chose the backup bid in light of G Squared's default.

*Tr.*, p. 86, lines 22-25; p. 87, lines 1-3.

All of these matters are, of course, intensely factual, involving the complexities of the transaction and the bankruptcy case as a whole with which the Bankruptcy Court was intimately familiar. The Bankruptcy Court's decision was correct and certainly not clearly erroneous under Bankruptcy Rule 8013.

16

**ARGUMENT**

**I.**

**HAVING CORRECTLY APPLIED THE LAW
IN THIS DISTRICT TO THE FACTS OF THIS CASE,
THE BANKRUPTCY COURT'S DECISION MUST BE UPHELD**

The Bankruptcy Court analyzed the facts of this case, correctly applied the applicable law, and determined that the risk to the Estate of allowing Appellant to attempt to close on the Lease far outweighed the harm suffered by Appellant if the Bankruptcy Court enforced the G Squared Contract and released the Down Payment to the Trustee.

"Where the terms of sale expressly provide that the defaulting bidder forfeits his earnest money deposit, such a term is enforced." *In re Target Two Assoc., L.P.*, 2006 WL 3068668, *6 (S.D.N.Y. Oct. 27, 2006). Such terms are binding even when the potential purchaser is unaware of them. *Id.* The only potential limit on such a holding, a finding of a fundamental error or compelling equity arising out of fraud, mistake or like infirmity, does not exist here.

In the *Target Two* case, Front Street, the potential purchaser, claimed it was unfair to make it forfeit its entire $1 million down payment (representing 8.5% of the purchase price) when it was unable to timely close on the purchase of property. After purchasing a 30-day extension of the time to close (in accordance with the parties' agreement), Front Street remained unable to close. The Bankruptcy Court permitted the seller to retain Front Street's down payment and Front Street appealed the Bankruptcy Court's decision to this Court. After initially remanding the case back to the Bankruptcy Court for further analysis, the District Court upheld the Bankruptcy Court's finding that retention of the down payment was appropriate because the potential purchaser had failed to

obtain prompt and firm commitments from financiers[10]. *Id.* Moreover, the Court held that under the laws of New York, forfeiture of a 10% down payment was appropriate. *Id.,* at *7.

Similarly, in *In re District 65*, this Court rejected a defaulting purchaser's attempt to recover its down payment premised on its inability to obtain financing. *In re District 65*, 206 B.R. at 679. Specifically, the Court found that because the contract "clearly was not conditioned upon or subject to the Purchaser obtaining financing", it was "totally inappropriate" to raise the lack of financing as a reason it should be able to recover its down payment. *Id.*

In the instant case, Appellant readily admits it failed to have financing in place at the time it bid on the Lease, *Tr.*, p. 20, lines 22-23, and acknowledged it was unlikely it would obtain the necessary financing. *Berkowitz Aff.*, ¶4.

The Bankruptcy Court carefully reviewed the parties' pleadings, which included extensive factual affidavits, and entertained extensive (almost 3 hours) oral argument and testimony. The Bankruptcy Court applied the correct legal standard, and its determinations of the facts concerning service of notices, harm to the respective parties, the equities of the case and the like were not clearly erroneous. Hence, the decision below must be affirmed.

## II.

### THE TRUSTEE'S CONDUCT WAS FAIR AND EQUITABLE AND THERE WAS NO FRAUD, MISTAKE OR INFIRMITY IN THE SALE

**A.    The Trustee's Refusal to Extend the Time to Close Was Fair**

Section 3 of the G Squared Contract sets forth the One Day Requirement but provides that

---

[10]    As set forth above, Section 16 of the G Squared Contract precluded a pre-closing transfer of ownership in Appellant and a third party investor would have created a situation whereby the sale of the Lease would be appealed or Global lost as the backup bidder. Thus, the instant case is distinguishable from *Target* as it relates to third party investors.

the "Seller may, in his sole discretion, <u>but is in no way required to agree to adjourn the Closing</u> at the request of Purchaser."  *G Squared Contract*, §3 (emphasis added).  Appellant was aware of the One Day Requirement when it executed the G Squared Contract.

Absent explicit, unambiguous language, the Trustee may refuse, even unreasonably, to consent to an adjournment of the closing.  *Caridi v. Markey,* 539 N.Y.S.2d 404 (2d Dep't 1989).  In *Caridi*, the court upheld the dismissal of a complaint that alleged that a landlord unreasonably withheld its consent to an assignment where the lease "ha[d] no clause requiring that the consent not be unreasonably withheld."  *Id.* at 405; *see also Mann Theaters Corp. v. Mid-Island Shopping Plaza, Co.,* 464 N.Y.S.2d 793, 797-98 (2d Dep't 1983) ("[W]here the lease contains an express provision restricting assignment or subletting without the landlord's consent, *the landlord may arbitrarily refuse consent for any or no reason . . . unless the provision requires that consent not be unreasonably withheld.*") (emphasis added), *aff'd*, 62 N.Y.2d 930, 479 N.Y.S.2d 213 (1984).

Moreover, the New York Court of Appeals has stated that clear, complete writings (especially those drafted by sophisticated business people) should be enforced according to their terms.  *Collard v. Village of Flower Hill,* 52 N.Y.2d 594, 439 N.Y.S.2d 326 (1981); *W.W.W. Assoc., Inc. v. Giancontieri*, 77 N.Y.2d 157 (1990).  For example, in *Collard*, plaintiff property owners applied to a town zoning board for a variance.  The zoning board denied the request without giving any reason for the denial, and the property owners challenged the zoning board's denial.  The Court of Appeals found that the zoning board's motion to dismiss should have been granted:

> [The property owners] would have us import the added substantive prescription – "which consent may not be unreasonably withheld" . . . .  The concept that [the property owners] would invoke is not obscure and language to give it effect was readily available had it been the intention of the parties to include this added stipulation.

*Id.* at 603, 439 N.Y.S.2d at 331.

Similarly, New York courts will not use the duty of good faith and fair dealing to imply contractual restrictions on a party's unconditional contractual right to withhold consent when such language is not a part of the contract. *See Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 390 (1995) (duty of good faith and fair dealing is not unlimited); *Keeney v. Kemper Nat'l Ins. Co.*, 960 F. Supp. 617, 624 (E.D.N.Y. 1997) (dismissing claim because "the implied covenant of good faith and fair dealing cannot be used to trump an explicit contractual provision"), *aff'd*, No. 97-7683, 1998 U.S. App. LEXIS 1226 (2d Cir. Jan. 27, 1998).

Thus, the law is clear: the Trustee was not required to consent to an extension of the One Day Requirement. To import such a term into the G Squared Contract, this Court would have to rewrite the explicit language of the G Squared Contract and reverse its own *Keeney* decision.

Moreover, New York courts have specifically interpreted the phrase "time is of the essence" to require performance on the required day unless the time for performance is extended by mutual agreement. *Grace v. Nappa*, 46 N.Y.2d 560, 565 (1979). In *Grace*, the purchaser of real property sought to recover his down payment when the seller could not comply with contract conditions and time was of the essence. *Id.* at 564. At the meeting set for the closing, the seller offered numerous alternatives to the contract requirements, each of which was rejected by the purchaser and the closing was ultimately aborted. *Id.* The purchaser sought the return of his deposit and, when the seller refused, sued. *Id.* at 565. The Court held that a time is of the essence clause negates reasonable performance and requires the parties to tender performance on the designated day. *Id.*; *see also In re District 65*, 206 B.R. at 679-80 (Court holds that "time shall be of the essence as against ... Purchaser on such adjourned date of the closing means just that. Being unwilling or unable to close

20

on the adjourned date does not relieve Purchaser of its obligations nor of its breach of contract").

Appellant's unsupported belief that the Trustee would accede to an adjournment (which did not happen here) cannot support its claim that it was treated unfairly. Courts have held that even reliance on an oral representation is unwarranted and not reasonable when the party knows that all changes must be made in writing. *Greenbaum v. Weinstein*, 131 A.D.2d 430, 431 (App. Div. 2d Dep't June 1, 1987).

In the instant case, the Bankruptcy Court stated:

I don't get a sense that there was any misrepresentation or fraud as to the closing. Right? I mean, there was no statement that we're going to – don't worry about what the contract says, we're going to close, you know.

Mr. Angel: I don't believe that there was as best I know a misrepresentation in the classic of a false holding, reliance, et cetera.

\*\*\*

The Court: I just -- put it this way. I don't think you can take what was stated on the record at the hearing on the sale as a commitment to close somewhere beyond the contract date, particularly given the fact that the Trustee reserved the right and the contract to close later.

\*\*\*

So it seems to me what Ms. Siegel said was perfectly consistent with the contract. It didn't change the trustee's rights under the contract.

*Tr.*, p. 24, lines 7-25, p. 25, lines 1-24.

The Trustee's decision to enforce the terms of the G Squared Contract was not unfair[11] to Appellant. The One Day Requirement was reasonable, rational and supported by the law of New York state. Moreover, the Bankruptcy Court considered Appellant's argument that the Trustee's conduct had altered that right and correctly concluded that the Trustee's conduct did not change his

---

[11]    Courts that have unwound sales as being unfair to bidders have done so when: (a) notice is insufficient, *see In re Farmland Indus., Inc.*, 284 B.R. 111 (Bankr. W.D. Mo. 2002); (b) sham bids were interposed, *see In re Rapier Sugar Feed Co.,* 13 F. Supp. 85 (D. Ct. W.D. Ky 1935) or (c) the bidding was collusive, *see In re Miami Gen. Hosp., Inc.*, 81 B.R. 682 (S.D. Fla. 1988).

rights under the G Squared Contract.

For all of these reasons, the Bankruptcy Court's decision was not clearly erroneous and the order authorizing the release of the Down Payment (the "Escrow Order") must be affirmed.

**B.    The Trustee Correctly Determined to Close with Global**

The Trustee was under no obligation to close with Appellant.  *Grace*, 46 N.Y.2d at 565-66 ("[o]nce the closing was aborted, moreover, it was not necessary for plaintiff to entertain further proposals from defendant . . .").  After Appellant failed to close, the Trustee's conduct was governed by his belief that G Squared could not (or did not want to) close on the sale of the Lease.  The Trustee made such determination in light of G Squared's unwillingness to increase the Down Payment (which would have been applied to the purchase price) and release the Down Payment from escrow, which the Trustee understood from his real estate counsel Ronald Sernau of Proskauer Rose LLP was standard procedure in these sorts of commercial real estate dealings where a party seeks more time to close.  Further indication of G Squared's unwillingness to close was evidenced by G Squared's failure to make any counter-offer to the Trustee's request, despite repeated invitations to do so.  And, as the Bankruptcy Court found, the Trustee risked losing its only other bidder, Global, if he gave Appellant more time to close.  *Tr.*, p. 60, lines 17-19; p. 61, lines 1-5.

The Trustee's decision was in accordance with the law, properly weighed the risks and benefits to the Estate of different courses of conduct and was well in the range of reasonableness.

**C.    Duty to Maximize the Return to the Estate**

A trustee serves as a fiduciary and must act in the best interest of the debtor's creditors.  *In re Bowman*, 181 B.R. 836 (Bankr. D. Md. 1995).  Among his jobs is to make sure the estate's creditors get paid.  *Id.* at 843.  In order to maximize the value of the Lease, the Trustee correctly

determined to proceed to close with Global. As noted by the Bankruptcy Court, if the Trustee had given:

> . . . G Squared more time until, you know, September 5th why doesn't the backup bidder simply say, oh, great. Well, now I'm off the hook. I'll come back to you sometime before October 11th and take the deal or not at a lower price, because then I know I'm the only guy in town.

*Tr.*, p. 62, lines 1-5. The Bankruptcy Court also explained that there was a limit to the Trustee's ability to keep the backup bidder in place, especially given the colloquy at the sale hearing where Global asked for the return of its down payment and the general limitation of reasonableness on keeping the bidder in place. *Tr.*, p. 85, lines 12-19. Moreover, an extension of time to close placed the sale in jeopardy vis-a-vis the October 15th drop dead date in the Stipulation.

The Trustee's determination to proceed to close with Global and retain the Down Payment was in fact compelled by his fiduciary duties to the creditors and the Estate.

**D.**     **The Trustee's Treatment of Global Was Fair Vis-a-Vis Appellant**

After G Squared defaulted and back-up bidder Global was advised that it was required to satisfy the One Day Requirement, Global reminded the Trustee that it had been willing and able to close in the first week of August but now needed to close in late September or October. *Tr.,* p. 58, lines 24-25; p. 59, lines 1-3.; *Siegel Aff.*, ¶30. The Trustee's determination to adjourn the Global closing on different terms than he was willing to adjourn the G Squared closing was first and foremost a result of the fact that Appellant had defaulted and Global was the sole remaining purchaser. In addition, Global: (a) negotiated with the Trustee, (b) agreed to increase and then release the full down payment and (c) waived all rights to the down payment. Appellant refused to do any of the above.

23

The differing treatment of Global and Appellant was fair and reasonable, and, in any event, well within the Trustee's business judgment.

**E.    The Trustee's Negotiations With G Squared Were Fair**

As set forth above, the Trustee was not obligated to modify the G Squared Contract or to continue negotiating with Appellant after it defaulted and, in fact, he determined it was not in the Estate's best interest to adjourn the One Day Requirement and risk losing Global.

The Bankruptcy Judge was mindful of this when he specifically addressed the issue of whether there was something "extraordinary" in the Trustee's decision not to continue discussing a revised closing with G Squared. *Tr.*, p. 84, lines 1-4. The Bankruptcy Court conducted a thorough analysis of the facts and concluded:

> So in weighing an extension, the Trustee had to weigh the risk of ultimately losing not only the bidder, but also the backup bidder and losing the benefit of having a now final order approving the transaction, so I can understand and find reasonable the Trustee's decision not to pursue a transaction whereby G Squared would remain the primary bidder.

*Tr.*, p. 85, lines 20-25.

As set forth above, and as evidenced by the blacklined version of the Down Payment Stipulation, the Trustee never contemplated extending Appellant's time to close. Rather, he tried to resolve a potential dispute. The Bankruptcy Court stated:

> That leaves the issue of whether while trying through the light viewed most favorably to G Squared to pursue negotiations over just that issue with G Squared or in the light more favorable to the Trustee testing the waters. The Trustee was somehow negotiating in bad faith because he had already entered into negotiations with and in fact maybe even had entered into an agreement with the backup bidder. There's no evidence or testimony that the trustee had told G Squared that it was speaking exclusively with it or he was speaking – or dealing exclusively with it or that the Trustee had actually waived any rights in connection with the breach of the purchase agreement. The Trustee clearly did not want to lose the backup bid because unlike losing the G Squared bid in the light of there having been a declared breach, there would be a risk that he would lose the back-up bid.

24

> And so while I can understand why Mr. Angel might be upset about their being simultaneous discussions about transactions with both G Squared and the backup bidder, I don't believe that those discussions were extraordinary in this context or resulted or rose to a level of fraud, mistake or like infirmity tainting the process.

*Tr.,* p. 86, lines 1-23.

Thus, the Bankruptcy Court correctly concluded that there had been no fraud, mistake or infirmities in the sale process or in the Trustee's treatment of Appellant.

## CONCLUSION

For all of the reasons set forth above, the Bankruptcy Court applied the correct legal standard and its factual findings were not clearly erroneous. Hence, the Escrow Order must be affirmed.

Dated:  Tarrytown, New York
        November 28, 2007

KITTAY & GERSHFELD, P.C.
Attorneys for the Appellee

 /s/ David R. Kittay
David R. Kittay (DK 0481)
100 White Plains Road
Tarrytown, New York 10591
(914) 332-8000