Herrick, Feinstein LLP
Paul Rubin (PR-2097)
Joshua J. Angel (JA-3288)
2 Park Avenue
New York, NY 10016
Tel: 212-592-1606
Fax: 212-592-1500
prubin@herrick.com

Larry I. Glick, P.C.
Larry I. Glick, Esq.
1305 Franklin Avenue
Garden City, NY 11530
Tel: 516-739-1111
larryglick@rcn.com

Attorneys For Appellants

ELECTRONICALLY FILED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

East 44th Realty LLC,

Debtor.

G SQUARED ASSOCIATES LLC, G SQUARED MANAGEMENT LLC, ALLEN GUTTERMAN, and MARK GUTTERMAN,

Appellants,

-against-

DAVID R. KITTAY, as Chapter 11 Trustee of East 44th Realty LLC,

Appellee.

Case No. 07-CV-09565 (PAC)

(Bankruptcy Appeal)

# APPELLANTS' REPLY BRIEF

G Squared Management LLC, G Squared Associates LLC, Allen Gutterman and Mark Gutterman (collectively, the "Appellants") by and through their undersigned attorneys, respectfully submit this Reply Brief in Support of Further Support of their Appeal from the Bankruptcy Court's Order.[1]

## SUMMARY OF ARGUMENT

The poverty of the Trustee's position is manifest by his inflammatory and nonsensical accusation, at the very outset of his brief, that "Appellant perpetrated a fraud on the Bankruptcy Court and Trustee . . . ." The reality is that G Squared provided the Trustee with a $1.67 million good faith deposit because the Trustee and his counsel gave it the impression that the Trustee would proceed with the transaction in a commercially reasonable manner. As shown below, the Trustee's own recent filing with the Bankruptcy Court reveals that: (i) the Trustee's own expert real estate counsel advised him many times against including the one day closing requirement in the sales contract because it was too one-sided; and (ii) Global had significant trouble obtaining financing and title insurance which it required in order to close--even though the Trustee granted Global seven additional weeks in which to close, on top of the ten weeks that elapsed between Global's execution of its original contract and its execution of the August 17, 2007 Letter Agreement with the Trustee. It is telling that the Trustee worked cooperatively with Global to accomplish a closing, despite the problems it had getting ready to close, and that the Trustee has not accused Global of perpetrating a fraud, "mocking the Court," or acting with "chutzpah."

The Trustee does not dispute Appellants' legal argument that a trustee's unfair treatment of bidders constitutes a fundamental error or compelling equity arising out of "fraud, mistake or

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in Appellants' opening brief dated November 13, 2007.

like infirmity" warranting the return of a bidder's good faith deposit. Instead, the Trustee offers a series of justifications for his disparate treatment of G Squared and Global that do not withstand scrutiny. It is undisputed that, after the Trustee declared G Squared to be in default and chose not to close with G Squared, he had the exact same contractual right to require Global to close on one business day's notice. The Trustee's undisputed failure to enforce his right to require Global to close immediately (as he did with G Squared) or, alternatively, demand that Global remain in place as the back-up bidder while G Squared be granted a short closing extension, is further evidence of the Trustee's unfair treatment of G Squared. No trustee should be permitted to breach his duty of impartiality under the guise or assertion of exercising "business judgment."

The Trustee has also failed to (i) address why the Debtor's estate should receive an undeserved windfall stemming from the Trustee's unfair treatment of G Squared, and (ii) balance the harm that forfeiture of the deposit would inflict upon Appellants against the policies supposedly being protected by the Trustee's conduct.

Accordingly, the Order of the Bankruptcy Court should be reversed.

## ARGUMENT

### A. The Trustee's Discrimination Against G Squared is Inexcusable

It is undisputed that the Trustee required G Squared to close on one business day's notice, but allowed Global nearly two months in which to close. The Trustee should have either held both bidders to the very same contractual term contained in the sale contracts, or he should have allowed similar commercially reasonable accommodations. The Trustee's contentions that he was afraid that he might lose his backup bidder or that the Debtor might appeal the sale, that G Squared did not make any counter offer to his demands (for $500,000 and then $830,000) in

return for an adjournment, that his "One Day Requirement" was reasonable and rational, and that he was concerned about maximizing the return on the sale and achieving "finality," are weak excuses that are contradicted by the facts.

(1) The Trustee Was Not At Risk of Losing His Backup Bidder. The fact that Global had told the Trustee that it could not close until sometime "in the Fall" (Trustee's Brief at 11, 23) means that the Trustee had tremendous leverage over Global. Global was contractually required to keep its offer open and to close as the backup bidder on just one business day's notice, and the Trustee was holding Global's $1,620,000 deposit. Under the circumstances, Global was in no position to demand the return of its deposit. The Trustee could have simply given Global the choice of closing on one business day's notice during the second or third week in August (which he knew Global was unable to do) or agree to remain as the backup bidder and keep its deposit in place for another fifteen business days--which was the extent of the adjournment G Squared had requested

(2) The Risk of an Appeal Was Negligible. There was no real concern that the Debtor might appeal, or that any such appeal would prevent the Trustee from selling the Ground Lease. As shown in our opening brief, the Trustee's counsel had advised the Bankruptcy Court at the August 8, 2007 sale hearing that the Debtor had no objection to the sale. Furthermore, the Trustee has not articulated any reason why the Debtor would have objected to granting G Squared the relatively short adjournment it requested while the Trustee held onto the G Squared and Global deposits.

Even if an appeal had been filed, the Trustee could have closed with G Squared, just as the Trustee was able to close with Global while this appeal was pending. To stop a closing--and there is no indication that the Debtor wanted to do so--the Debtor would have been required to

obtain a stay pending appeal. That would have required the Debtor to show that it would suffer irreparable harm unless a stay were granted. See In re Adelphia Comm. Corp., 361 B.R. 337, 346 (S.D.N.Y. 2007). The Debtor would also likely have been required to post a bond in order to obtain a stay. See id. at 368; Fed. R. Bankr. P. 8005. No one has seriously suggested that the Debtor would have suffered irreparable harm from a fifteen business day adjournment of the closing, or that it was in any position to post a bond. Absent a stay, there would have been no obstacle to prevent the Trustee from closing with G Squared, and following the closing, pursuant to section 363(m) of the Bankruptcy Code, an appellate court would lack jurisdiction to review the sale order, except on the limited issue of whether the sale was made to a "good faith" purchaser. In re Gucci, 105 F.3d 837, 838 (2d Cir.), cert. denied, 117 S. Ct. 1552 (1997). Thus, an appeal by the Debtor was never a genuine concern of the Trustee.

(3) The Trustee Acted Unreasonably and Unfairly, and He Ignored the Advice of His Own Expert Real Estate Counsel. The Trustee contends that his decision not to proceed with G Squared was reasonable because G Squared did not submit a counter-offer after the Trustee had demanded (i) on August 10, that G Squared make an additional immediate non-refundable deposit of $500,000 to obtain a three business day extension of the closing date and (ii) on August 13, that G Squared increase its deposit by $830,000 in return for a fifteen business day adjournment. The Appellants did not submit any counter-offer simply because they were unable to offer anything near the stratosphere of what the Trustee was demanding of them. The Trustee offered Appellants absolutely no clue that the Trustee would accept anything along the lines of the $80,000 that he accepted from Global in return for a generous seven week closing extension. If $80,000 was all the Trustee had demanded, G Squared could have easily satisfied that demand in exchange for the requested 15 business day adjournment. In other words, the Trustee cannot fault G Squared for not making a counter-offer, when the Trustee made excessive demands of G

Squared and he gave no indication that he was actually prepared to accept an amount that was less than 10% of that demand.[2]

The Trustee also tries to excuse his conduct by arguing that his "One Day Requirement" to close was reasonable and rational (Trustee's Brief at 21). In a stunning disclosure contained in an application for payment of commissions that the Trustee filed in the Bankruptcy Court on November 9, 2007, the Trustee candidly admitted that his own expert real estate counsel and the lender in this case had advised him "many times" against including the One Day Requirement in the form of contract he used because it was too one-sided. Under the heading "Drafting the Proposed Form of Contract," the Trustee described the process as follows:

> K&G [the law firm Mr. Kittay founded and heads] worked closely with real estate counsel in drafting the form of contract. Although Proskauer is an expert in real estate matters, the Trustee directed K&G to review each iteration of the contract to make sure that it addressed bankruptcy issues and was drafted in a manner most advantageous to the Debtor's Estate and the Trustee In fact, **there were many times when the Lender and Proskauer informed the Trustee that the language he sought to insert into the contract, and the structure of the deal (particularly the timing of the sale and closing), were so one-sided that no party would ever sign the contract as contemplated by the Trustee and K&G.** The Trustee remained convinced that in order for the deal to work, it would have to work as he envisioned it. The proposed form of contract was provided to potential purchasers in the form requested by the Trustee.
>
> . . . .Moreover, the proposed form of contract contemplated that the closing on the sale of the Lease would occur one business day after notice of entry of the order approving the sale.

Appendix at ¶¶44-45 (certified copy, emphasis added). It is most disingenuous for the Trustee to characterize as "rational" or "reasonable" a specific term that was so onerous when drafted that his own real estate professionals and the lender sought "many times" to dissuade him from inserting it into the form contract of sale.

---

[2] It is noteworthy that G Squared actually did negotiate with the Trustee after he declared G Squared to be in default. But the Trustee denies that his counsel negotiated with G Squared (on August 21, 2007) the terms of a closing to take place before the end of August, 2007.

In that same November 9, 2007 filing, the Trustee revealed that Global had great difficulty closing even though it had been granted a seven week extension of the closing date, after it already had an additional ten weeks to prepare for a closing following its execution of its contract with the Trustee in early June, 2007, long before the auction was held. The Trustee's application states:

> . . . .Global had to close on the purchase of the Lease on or before October 11, 2007 or forfeit its down payment. As the date of the closing drew close, it became clear to [the Trustee] that Global was having difficulties obtaining the financing necessary to close on the purchase of the Lease.
>
> At one point, after Global had sought financing from many, many sources, Global asked [the Trustee] if it could assume the Debtor's Debt. . . .
>
> Global also had problems finding a title company that would insure title.

Appendix at ¶¶ 104-106.

The disparity in treatment of the respective bidders is plainly evidenced by the Trustee's statement to the Bankruptcy Court in his commission application that he was "somewhat surprised" that Global had trouble obtaining financing to close after the Trustee had granted it the seven week adjournment. Appendix at fn. 4, p.35. In contrast, the Trustee professed to the Bankruptcy Court that he was "flabbergasted" to learn that G Squared could not close on just one day's notice. Dock. No. 322, p.71, line 12; Trustee's Brief at p.11.[3] Going further, the Trustee now accuses G Squared of perpetrating a fraud and "mocking" the Court because it was unable to close on just one business day's notice. Trustee's Brief at 1. These completely inconsistent characterizations are further manifestations of the Trustee's blatant and unmistakable bias in preferring Global over G Squared. The reality is plain: One business day is not a commercially reasonable amount of time for the parties to be in a position to close on the purchase of the

[3] That credit markets were suddenly roiled in the second week of August, 2007, affecting Appellants' ability to complete the sale of a property that would have generated the cash they needed to purchase the Ground Lease, apparently meant nothing to the Trustee.

Ground Lease. The Trustee's statement that he concluded that G Squared was unable or unwilling to close because it was not ready to close on one business day's notice (Dock. No. 322, p.71, lines 10-14) simply cannot be taken at face value.

(4) The Trustee's Invocation of the Policies of Finality and Maximizing Return Ring Hollow and Do Not Excuse the Trustee's Breach of His Duty of Impartiality. The Trustee further attempts to justify his conduct by arguing that he owed a fiduciary duty maximize the return to the estate "to make sure the estate's creditors get paid." Trustee's Brief at 22. This argument does not apply, because here, unlike the situation in Target Two cases, the sale to either bidder would produce funds sufficient to pay all creditors in the case in full. Even the Bankruptcy Court made this observation. Dock. No. 322, p.88, lines 2-6.

The generic slogan that the Debtor's estate had an interest in obtaining "finality" as to the auction sale does not, under any circumstance, justify the Trustee's unfair and disparate treatment of G Squared here. It is impossible under the facts of this case to fathom how an interest in "finality" would have been harmed by granting G Squared the short adjournment that it had requested. This is especially so because the Trustee had at his disposal bargaining leverage to require Global to either close immediately (i.e., lose its deposit since it could not close until the Fall) or to remain in place as the backup bidder. Moreover, the interest in finality of bankruptcy sales, like the interest in maximizing the return on the sale of a debtor's asset, does not permit bankruptcy trustees to breach their duties of fairness and impartiality, or to exercise their discretion in a discriminatory manner so as to favor one bidder over another.

The Trustee emphasizes the issue of contract interpretation under New York law. But New York law, like federal bankruptcy law, has long recognized that when a sale is made by an officer of the court, "the court may direct its officer to act in accordance with fairness and

equity." Lane v. Chantilly Corp., 251 N.Y. 435, 167 N.E. 578 (1929). Indeed, as the New York Court of Appeals has recognized, one who is contracting with an officer of the court "may feel some sense of security against hidden pitfalls, and be lulled into signing a contract with an officer of the court which he would not make with an individual without further investigation." Id., 251 N.Y.S. at 438. Bidders at bankruptcy auction sales have a right to expect bankruptcy trustees to comply with their fiduciary duty of impartiality--a duty that does not exist in private real estate transactions.

This appeal is about the Trustee's disparate treatment of G Squared and Global. The Trustee's blatant and inexcusable bias favoring Global is unworthy of a federal bankruptcy trustee, or any officer of any court. The equities in favor of G Squared are compelling.

**B. The Trustee Virtually Ignores Appellants' Arguments that Equity Abhors a Forfeiture and that the Estate Was Not Entitled To An Unjust Windfall**

It was inequitable for the Bankruptcy Court to grant the Motion and order G Squared to lose its deposit because equity abhors a forfeiture and will avoid an unjust windfall. The Trustee insists that the issue on appeal is whether the Bankruptcy Court's decision was clearly erroneous. Trustee's Brief at 2. He completely ignores Appellants' argument that the Bankruptcy Court abused its discretion here, not simply by applying the wrong legal standard (missing the point that unfairness to bidders warrants return of a deposit), but also by ordering a forfeiture so as to confer an unwarranted substantial windfall upon the Debtor's estate.

The Trustee asserts in his Brief:

> The Bankruptcy Court analyzed the facts of this case, correctly applied applicable law, and determined that the risk to the Estate of allowing Appellant to attempt to close on the Lease far outweighed the harm suffered by Appellant if the Bankruptcy Court enforced the G Squared Contract and released the Down Payment to the Trustee.

Trustee's Brief at 17. This statement is inaccurate. The Trustee did not and could not cite to any page of the Bankruptcy Court's oral ruling (which is contained in the September 12, 2007 hearing transcript), to support this statement as to balancing of harm, **because the Bankruptcy Court made no such determination**. The Bankruptcy Court erred because it did not balance the harm to G Squared for losing its deposit against the policies supposedly being protected (such as benefit to the Debtor's estate). The Bankruptcy Court further abused its discretion because it did not weigh the equities at all, except in one respect. As an afterthought, after having announced his decision to grant the Motion, the Bankruptcy Court acknowledged that the purchase price to be paid by Global would satisfy all claims in the case, but stated that equityholders could enjoy the benefit of retaining G Squared's deposit because they did not participate in the process. (Dock. No. 322, p.87, line 24 to p.88, line 17). That is not a valid legal foundation to order G Squared to lose its deposit in the face of the Trustee's blatantly unfair and disparate treatment of bidders.

It is ironic that the Trustee cites New York Property Holding Corp. v. District 65, et al., 206 B.R. 676 (S.D.N.Y. 1997) to support the proposition that returning G Squared's deposit would be inequitable and unfair to the Debtor's creditors. The facts of that case actually highlight the inequity of the harm inflicted by the Bankruptcy Court's Order. In New York Property Holding, the Bankruptcy Court issued an order dated July 6, 1993 authorizing the debtor, a union, to sell property also located in Manhattan to the appellant. 206 B.R. at 678. The initial scheduled closing date was August 20, 1993. See id. After the parties were unable to close by that date, the debtor requested and the Bankruptcy Court ordered a 67-day extension of the closing date, to October 29, 1993, with time of the essence as against the purchaser. See id. The purchaser could not close by that date. Despite having been given so much time in which to close, and despite the time of the essence requirement to close by October 29, 1993, at a hearing

on December 2, 1993, the Bankruptcy Court offered the purchaser yet another chance to close the transaction at that time. 206 B.R. at 679. After, and only after, the purchaser responded that it wanted yet another week in which to close, the Bankruptcy Court refused and held the purchaser to be in default. See id. Based on that record, the Bankruptcy Court held on February 9, 1994 that the purchaser must forfeit its deposit. See id.

Here, G Squared was not given two months or even two weeks to close on the purchase of a multi-million dollar commercial real estate transaction involving a ground lease. To require it to forfeit a $1.67 million good faith deposit for not closing on one business day's notice was unquestionably inequitable.

## CONCLUSION

Appellants should not forfeit $1.67 million--and the Debtor's estate should not receive such a windfall-- merely because the Trustee decided to enforce the rules selectively and unfairly in this case.

Dated: New York, New York
December 10, 2007

HERRICK FEINSTEIN LLP

By: /s/ Paul Rubin
Paul Rubin (PR-2097)
Joshua J. Angel (JA-3288)
2 Park Avenue
New York, NY 10016
Tel: 212-592-1400
prubin@herrick.com

Larry I. Glick, P.C.
Larry I. Glick, Esq.
1305 Franklin Avenue
Garden City, NY 11530
Tel: 516-739-1111
larryglick@rcn.com