# APPENDIX

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

Return Date: December 5, 2007
Return Time: 10:00 a.m.

--------------------------------------------------------x

In re:                                          :       Chapter 11
                                                :
EAST 44TH REALTY, LLC,                          :       Case No. 05-16167 (RDD)
                                                :
                        Debtor.                 :
--------------------------------------------------------x

## FIRST APPLICATION OF DAVID R. KITTAY
## ALLOWANCE OF INTERIM STATUTORY COMMISSION

<u>APPLICANT</u>: David R. Kittay

<u>FIRST PERIOD</u>:  February 14, 2007 through October 31, 2007

| | | |
|---|---|---|
| Fees Previously Sought: | $ | 0.00 |
| Disbursements Previously Sought: | $ | 0.00 |
| Commissions: | $ | 540,999.90 |
| Interim Fees Sought (90%): | $ | 486,899.91 |
| Interim Disbursements Sought: | $ | 0.00 |

I hereby attest and certify on 12/04/07
that this document is a full, true and correct
copy of the original filed on the court's
electronic case filing system.

Clerk, US Bankruptcy Court, SDN

By: _____ Deputy Clerk

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re:                                              :        Chapter 11
                                                    :
EAST 44TH REALTY, LLC,                              :        Case No. 05-16167 (RDD)
                                                    :
                                 Debtor.            :
-------------------------------------------------------x

## FIRST APPLICATION OF DAVID R. KITTAY
## ALLOWANCE OF INTERIM STATUTORY COMMISSION

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

The application of David R. Kittay, ("Applicant"), Chapter 11 Trustee for the estate of East

44th Realty, LLC, (the "Debtor"), respectfully represents that:

### PRELIMINARY STATEMENT

1.      The Court is intimately familiar with this case and with the Trustee's efforts

and ultimate success.   Nevertheless, procedure requires us to some extent to disregard any

appropriate sense of modesty and to document why this case was unusual and the results

extraordinary.

2.      In the midst of bitterly contested litigation among implacable parties in state,

federal and religious fora, David R. Kittay (the "Trustee" or "Applicant") was appointed Chapter 11

Trustee of an entity which was losing money on its sole asset, a ground lease that the Landlord and

the state court held to be terminated.   Moreover, within days of his appointment, the Trustee

discovered that the tenants' security deposits were missing, and had good cause to worry that he, as

a fiduciary, could be held personally responsible to restore them.   If that were not bad enough, after

the Trustee was appointed he discovered that there was inadequate insurance to protect the Estate

and apparently no money to pay for it.   It was a trustee's nightmare.

3.      All the parties in interest told the Trustee that a sale could not be accomplished and that the case was a disaster for varying reasons.  Nevertheless, the Trustee found a way to sell the ground lease, resolve the parties' disputes, settle the statutory Section 365 cure cost issue and secure two purchasers willing to pay enough money for the Debtor's ground lease to:  (a) satisfy the claims of the landlord and the lender; (b) provide a significant distribution to holders of unsecured claims; and (c) make a distribution to equity.  Along the way, the Trustee restored the tenants' security deposits, retained a management company committed to managing and maintaining the Property expertly and cost-efficiently and made over-due structural repairs to the building.

## THE INITIAL INVESTIGATION

4.      As this Court is aware, East 44th Realty, LLC's (the "Debtor's" or the "Estate's") principal asset was a ground lease (the "Ground Lease") the Debtor entered into with East Forty-Fourth Street L.L.C. ("Landlord") to real property located at 228-238 East 44th Street, New York, New York (the "Property").  In addition, the Debtor was "Sub-Landlord" for 164 residential and four commercial leases (collectively, the "Sub-Leases"; the Ground Lease and the Sub-Leases are collectively referred to hereinafter as the "Lease") the Debtor entered into as landlord with sub-tenants at the Property.

5.      The Trustee was appointed at the bequest of the Landlord[1] to sell the Lease, distribute the proceeds of such sale and run the Property while the sale was pending.  The Court determined to appoint the Trustee with all the powers set forth in Chapter 11 of Title 11, United State Code (the "Bankruptcy Code") Section 1104.  Before the Trustee could decide what action to

---

[1]      The Debtor's secured lender (the "Lender" or the "Bank"), New York Community Bank, subsequently joined in the Landlord's motion.

2

take, he believed it necessary to understand the nature of the asset he might sell and what had impeded the parties' sale of the Lease pre-and- post-petition. Not surprisingly, the picture painted for the Trustee, as refracted through the prism of the parties' realities, was as varied as the colors of the rainbow.

6.     Applicant and his counsel met with the Debtor's principal Joseph Bildirici ("Bildirici" or "Equity") immediately after the Trustee was appointed. Bildirici told a tale of woe occasioned solely by the Landlord. From Bildirici's perspective, the Debtor was drowning in litigation and legal fees wrought by a vengeful landlord. Mr. Bildirici painted a picture of an earnest group of Equity which, because it initially had failed to make a mere $15,000 repair, was now forced to try to stave off the Landlord's efforts to recover the Lease for its own benefit. Equity believed that the Landlord's legal fees would, at most, be a few hundred thousand dollars not the million dollars the Landlord then claimed. In Equity's view, the Debtor should be allowed to assume the Lease, carry on with its business and not lose the multi-millions it invested in the Property.

7.     When asked by the Trustee how the Debtor proposed to cure the outstanding defaults and provide adequate assurance of future performance, Bildirici explained that the cure costs were, in fact, *de minimus*. According to Bildirici, the Debtor had now made all necessary repairs on the Property and was in compliance with the terms of the Lease. Moreover, the Debtor's principal assured the Trustee that the Landlord's legal fees were vastly overstated, as evidenced by the Court's earlier finding that the Debtor was required to only escrow $300,000 to proceed with the Debtor's assumption motion. Proof of this, Bildirici claimed, would be borne out when the Landlord was forced to provide the discovery the Debtor sought from the Landlord in the context of the Debtor's motion to assume the Lease.

8.     Finally, Bildirici explained that his Lease operated at a profit and the revenue

3

stream resulting from the Sub-Leases was sufficient to satisfy any and all obligations to third parties, including the Landlord. From Equity's perspective, assumption of the Lease by the Debtor was the only equitable course of conduct. The sale of the Lease by the Trustee, Equity asserted, would only benefit the Trustee (through increased commission) and those who schemed to harm Equity – the Landlord and arguably, the Lender.

9.      The Landlord's reality was 180 degrees apart from the Debtor's. When the Trustee and his counsel Kittay & Gershfeld, P.C. ("K&G") met with the Landlord he told a story that began with the unauthorized assignment of the Lease to the Debtor and years of expensive litigation engendered as a result of the Debtor's failure to satisfy its obligations delineated under the Lease. This failure resulted in the termination of the Lease no later than April 1, 2005. The Landlord also believed that, as a result of the Lease termination, the Sub-Lease proceeds (aggregating approximately $2 million) and the outstanding legal fees (which also totaled well in excess of $1 million) belonged to the Landlord.

10.      Assuming the existence of the Lease solely for purposes of its conversation with the Trustee, the Landlord told Applicant and the Trustee that the Lease at issue was not financially viable because the amount the Debtor owed to the Lender[2] and the Landlord, far exceeded the value of the Lease. The Landlord insisted that, due to the open-ended, back-end terms of the Lease, the Trustee would never be able to find a purchaser willing to purchase the Lease for an amount sufficient to satisfy the Landlord's and the Lender's claims. The Landlord's counsel advised

---

[2]      New York Community Bank was successor by merger to Roslyn Savings Bank, the entity which had originally executed the Consolidated Amended and Restated Promissory Note dated December 4, 2002 and the Consolidated, Amended and Restated Mortgage, Security Agreement and Assignment of Leases and Rents made December 4, 2002.

the Trustee and his counsel that although earlier in the case the Landlord had been willing to amend the terms of the Lease to make it more financially appealing to potential purchasers, the Landlord was no longer willing to do so. Instead, the Landlord offered to "purchase" the Lease in an amount that would pay the Lender a portion of what it was owed and the holders of unsecured claims in full. The Landlord noted that because it would also be receiving less than it was entitled to under the terms of the terminated Lease, requiring the Lender to receive less than the full amount it was owed was equitable and, from the Landlord's perspective, generous. The Landlord also analyzed for Applicant the income generated by the Sub-Leases, the Debtor's operating reports and the Landlord's calculation of how the Sub-Leases generated insufficient income to make the Lease profitable. The foregoing, the Landlord argued, further supported the Landlord's position that the Lender should be willing to accept a portion of what it was owed and call it a day. The Landlord also advised the Trustee and Applicant that if the case continued, the Landlord would ultimately prevail in its argument that the Lease had terminated pre-petition and, ultimately, the case would be converted to a "no asset" Chapter 7 case.

11.    Finally, the Landlord unequivocally declared that it was done dealing with the Debtor and would never agree to the Debtor assuming the Lease. The Debtor's past conduct, which, from the Landlord's perspective included failure to make repairs to the Property, failure to protect the Landlord's interests and a course of frivolous litigation, precluded the Debtor from ever establishing adequate assurance of future performance. Moreover, the Landlord stated that it was owed in excess of $1 million in legal fees – not the $300,000 the Debtor claimed.

12.    The Trustee next spoke with representatives of the Bank. The Bank refused to discuss reducing its claim and to even meet with the Landlord. The Lender claimed that it had

5



any number of purchasers who would be willing to purchase the Lease in an amount sufficient to satisfy the Lender and the Landlord in full. Moreover, the Bank indicated that it would be willing to finance the potential purchaser.

13.    Boiled down to its base elements, these were the facts confronting, and possibly confounding, the Trustee: (i) the Debtor's only asset, the Lease, presented as a less than desirable asset given the back-end terms which required a significant increase in rental payments owed to the Landlord while the cash flow generated from the sub-leases was insufficient to support the additional rent obligations: (ii) trust funds, in the form of the tenants' security deposits had been commingled with operating funds and had been utilized to bolster the inadequate rental income stream; (iii) a variety of real estate brokers, real estate attorneys and investors had unequivocally stated that the Lease was not saleable; and (iv) even if the Trustee found a willing purchaser, it was unlikely the purchaser would be willing to pay an amount sufficient to satisfy the Estate's obligations under Bankruptcy Code Section 365 because neither the Landlord nor the Lender were willing to compromise their claims. In addition, the Lender and the Landlord were at loggerheads personally, professionally and economically and it was unlikely the Trustee would be able to convince either to work together for the common good. The situation looked bleak.

14.    In these circumstances, the many trustees would have recommended that the case be converted to a case under Chapter 7 of the Bankruptcy Code and cut his losses then and there. This Trustee did not. Instead, the Trustee forged ahead, uncertain but hopeful that a focused, two-prong strategy might result in the successful sale of the Lease and a meaningful distribution to the Debtor's creditors and equity-holders. The Trustee retained a real estate broker to aggressively market the Lease. At the same time, the Trustee began months of arduous, intense negotiations not

6



only with the Landlord and the Lender individually but between the Landlord and Lender, all with the single purpose of compromising and settling the parties' statutory cure costs. Working against all odds, the Trustee forged ahead certain that a sale could be effectuated.

**Insurance Issues**

15.    The Trustee was appointed on February 16, 2007.  On that same day, Applicant and his counsel met with the Landlord and learned, among other things, that the Lease required the Debtor to purchase insurance to protect the Landlord and that the current insurance was due to expire on March 6, 2007. Applicant was advised that the Debtor had, in an attempt to comply with terms of the Lease, proposed an insurance policy package that was economically superior to the insurance purchased in previous years by the Landlord. Mr. Tofel, counsel to the Landlord, advised Applicant that the insurance proposed by the Debtor did not comply with the terms of the Lease, but that he would be open to potentially allowing the Trustee/Debtor to be added to his policy as an additional named insured if the parties could come to an agreement that by adding the Trustee/Debtor the Landlord would not be waiving his rights to continue to claim that the Lease had previously terminated.  Later, however, the Landlord stated that it was not amenable to this arrangement unless the Trustee guaranteed that the Court would not find that the Landlord had waived his rights.  The Trustee could not make such a guarantee.

16.    Applicant contacted the Debtor's insurance broker (the "Broker") and requested that she go through the Landlord's objections to the proposed policy and advise Applicant of the remedies needed to satisfy the requirements of all of the parties.  The Broker advised Applicant that she was completely unaware that the Debtor was in Chapter 11 and that the bankruptcy status might have a negative impact on the Trustee's ability to obtain the required

7



insurance. The Trustee requested that he be added to the policy as a named insured and was told by the Broker that the Broker was unable to provide an immediate answer to Applicant.

17.    Applicant, through his counsel, continued to pursue the insurance issue over the next week. As a result of his investigation, the Trustee learned that the Debtor had obtained only liability insurance. The Debtor had no insurance coverage for the Property nor for the rental income stream from the building tenants in the event of a fire or other property damage. Applicant also learned that the Landlord had property and liability coverage, but that the coverage was for the Landlord only and that the Landlord would not, in any event, add the Trustee to the policy as a "named insured". The Landlord forwarded a stipulation to Applicant for his review but the terms of the stipulation went well beyond the reservation of rights clause the Landlord claimed it needed. Moreover, the Trustee believed that merely adding himself as an additional insured on the Landlord's policy would not adequately protect the Estate if there were an incident that resulted in liability/damage to the building that did not result from the Landlord's actions.

18.    Applicant sought counsel from the insurance broker he used in his capacity as a Chapter 7 Trustee; the Broker; the management company the Trustee was seeking to retain; real estate counsel; the Landlord; and the Debtor's principal. Ultimately, Applicant concluded the following coverage was required: (a) Landlord's real property and liability coverage; (b) Landlord's property insurance including "rental stream income" coverage (to protect the Landlord's rent received from the Debtor); c) liability insurance for the Trustee/Debtor; and (e) errors and omission insurance for himself.

19.    Having determined what type of insurance was required, Applicant worked diligently to obtain coverage. Although Applicant sought quotes from many sources, ultimately,



only one source of coverage was immediately available. Moreover, the cost of the insurance was approximately $180,000. Although the Debtor's Estate had the money to pay for the insurance, the Trustee was bound by cash collateral restrictions. Applicant's Chapter 7 insurance broker advised him that he could finance the cost of the property and liability insurance.

20.     Because the Lender was a secured creditor and entitled to adequate protection, the Debtor, the Landlord and the Lender had previously entered into cash collateral stipulations which had been approved by the Court. These cash collateral stipulations included an itemized budget which did not include the cost of financing additional insurance coverage. Accordingly, Applicant was required to negotiate an agreement with the Landlord and the Lender pursuant to which the terms of the parties' previously approved cash collateral orders (which included Court-approved budgets) could be modified.

21.     Applicant negotiated a form of stipulation with the Lender and the Landlord which allowed the Trustee to finance the insurance. The Trustee submitted the stipulation which was so-ordered by the Court on March 15, 2007. As with all negotiations with the Landlord, each negotiation was incredibly difficult because Mr. Tofel is tenacious advocate for his client.

**Decision to Retain a New Managing Agent**

22.     Prior to the Trustee's appointment, the Debtor hired B&F Imports ("B&F") as its managing agent. B&F is owned and operated by Bildirici. When the Trustee went to B&F's offices, he observed that the tenants' security deposits had been commingled with the Debtor's operating accounts. In addition, upon a cursory review, it became clear that, absent the commingled monies, there were insufficient funds for the Debtor to operate the Property. Because B&F had mishandled the Debtor's funds, the Trustee determined to immediately retain an independent

9



company to serve as managing agent for the Property.

23.     The Trustee and his counsel met with a number of management companies and the Trustee determined to retain Norwax Associates, Inc. ("Norwax"). The Trustee based his decision on the fact that Norwax has over twenty-five years' experience managing rental properties for various bankruptcy trustees and state and federal receivers, as well as for private owners. In addition, Norwax is an approved property manager for the Unified Court System of the State of New York.

**The Cash Collateral Stipulations**

24.     As set forth above, the Landlord's position throughout the case has been that the Lease terminated no later than April 1, 2005. From the Landlord's perspective, all of the money accruing to the Debtor as a result of the Sub-Lease income belonged to it. Thus, the Landlord had objected to the use of what it perceived to be its money from the inception of the case.

25.     On August 5, 2005, the Debtor filed its *Emergency Motion for Order (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection to 11 U.S.C. §§ 361 and 363, and (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)* (the "Cash Collateral Motion") seeking authorization to use the Lender's cash collateral (the "Cash Collateral") on the terms and conditions negotiated with the Lender. After a hearing on August 10, 2005, the Court permitted the Debtor and the Lender to stipulate to certain matters including the limited use of cash collateral, subject to a reservation of the Landlord's rights concerning, among other things, the termination of the Lease and the pre-petition assignment of the Sub-Lease proceeds to the Landlord. The Debtor's use of the Cash Collateral was continued throughout the case until the appointment of the Trustee.

10



26.     After the Seventh Cash Collateral Stipulation was so-ordered, the Trustee was appointed and the Trustee, the Lender and the Landlord agreed that good cause existed to modify the Seventh Cash Collateral Stipulation to provide for the payment by the Trustee of certain expenses, including insurance and other expenses for the months of February 2007 and March 2007, and therefore entered into the *Stipulation Regarding Trustee's Use of Cash Collateral*, which was so ordered by the Court on March 5, 2007 (the "March 5th Stipulation"). By Order dated March 27, 2007 (the "March 27th Stipulation"), the Court modified the Seventh Cash Collateral Stipulation and the March 5th Stipulation to:  (1) permit the Trustee to make certain payments from the Lender's Cash Collateral, (2) extend the terms of the Cash Collateral Stipulation and March 5th Stipulation through April 9, 2007 and (3) adjourn the March 29, 2007 hearing on cash collateral to April 10, 2007.  The cash collateral stipulation has been periodically modified and extended throughout the case.

27.     Because the Landlord perceived all of the Sub-Lease Proceeds as belonging to it, Applicant, the Lender and the Landlord were only able to negotiate cash collateral stipulations of a very short duration.  Applicant was frequently required to analyze upcoming expenditures (both fixed and otherwise) and the incoming rental stream and make budget proposals to the Lender and the Landlord.  At times, Applicant was forced to negotiate with the Landlord and the Lender on issues related to the cost of insurance.  The Landlord took the position that, because the insurance served to protect the value of the Lender's collateral, the Lender rather than they Estate should pay for the insurance.  Applicant spent considerable time negotiating with both attorneys for the Landlord and the Lender, and ultimately, the parties agreed that the Estate would cover the cost of the insurance.  At various points, repairs became necessary that required Applicant to work with Norwax

11



to obtain price quotations and then negotiate approval of such expenditures with the Landlord and the Lender. With the exception of one extension, which the Landlord objected to, the parties were able to amicably resolve their issues.

**Repair Issues**

28.     As set forth above, Equity failed to properly maintain the Property. Accordingly, the Trustee was required to address many repair issues. As the summer drew near, Applicant was advised that the air conditioning in the building lobby was not working properly. Applicant immediately contacted Norwax and directed it to investigate the claim and report back to him with its findings. Shortly thereafter, Norwax informed the Trustee that although the air conditioning in the building's apartments was functioning, the air conditioning in the building's lobby was not working and hadn't been in approximately three years.

29.     The decision to repair, or not repair, the air conditioning in the building lobby was more complex than one might think. Prior to learning about the air conditioning, the Trustee had entered into a contact to sell the Ground Lease on an "as is- where is" basis. Thus, the sale of the Ground Lease could occur, at no cost to the estate, even if the air conditioning was not repaired. However, the Trustee, in his capacity as a fiduciary, believed that he had an obligation to maintain the Property in a safe manner and give the tenants a benefit they were entitled to enjoy. The Trustee also had to balance the benefits of repairing the air conditioning with the costs related to the repairs.

30.     The Trustee directed Norwax to obtain bids or quotations for performing the required work on the air conditioning. After receiving the bids, the Trustee, through his counsel, had many conversations with the Landlord and the Lender over the decision to repair the air conditioning. These conversations were necessary because the repair of the air conditioning was an expense

12



outside the Court-approved budgets in the cash collateral orders.

31.    Ultimately and in connection with an additional deposit from Global Capital Holding LLC's (as described below) the Trustee was able to convince the Landlord and the Lender that repair of the air conditioning was in their best interest.  Failure to maintain the building would diminish the value of the Lender's asset and potentially diminish the Landlord's rental stream of income.  The Landlord and the Lender consented to the repairs and the Trustee retained Manhattan Heating and Cooling to repair the air conditioner handlers at a cost of approximately $100,000.

32.    During his tenure, the Trustee also learned that the elevators were not working to their full capacity.  K&G received a phone call from a tenant reporting that the elevators were frequently broken.  K&G reported this information to the Trustee who immediately directed Norwax to determine the nature of the problem with the elevators.  Norwax spoke to the building superintendent and learned that for a number of weekends, one of the two elevators was out of service.  Moreover, the Trustee also learned that the building had been cited for violations related to elevator repair issues.

33.    The Trustee directed Norwax to contact the company under contract to service the elevators and learn why the elevators were not functioning properly and why violations had been allowed to occur.  Applicant was informed that the problems with the elevator that resulted in the building violations were not problems covered under the elevator service contract.  Again, the Trustee analyzed if it was in the Estate's best interest to fix the elevator and determined that it was because elevators that did not work posed a health and safety issue for building tenants. Accordingly, the Trustee directed Norwax to obtain quotations for the repair work.

34.    During the Compensation Period, Applicant also learned of problems with the



cold water downdraft tank. As with the air conditioning and the elevators, the Trustee directed Norwax to investigate the problem and report back to him. After receiving the requested information, the Trustee determined that it was necessary to make the repair and he did so. Of course the Trustee also addressed and responded to the day-to-day issues at the building and responded to inquiries from the tenants and Norwax.

## SALE OF THE LEASE

### Decision to Sell the Lease

35.     Although the Debtor had urged the Trustee to let it assume the Lease, the more the Trustee learned about the case, the less viable this option seemed. For example, the Debtor's failure to segregate tenant deposits (and the need to use these monies for operations) would render the Debtor unable to provide adequate assurance of future performance. Moreover, although the Debtor had retained the real estate broker Marcus & Millichap ("M&M") to market the Lease, it had done so without informing M&M that the Debtor had filed for bankruptcy protection and without obtaining Court permission to retain M&M. The Trustee also learned that the Debtor failed to entertain offers brought to it by M&M which would have satisfied the claims of the Landlord and the Lender because the offers did not result in a great enough distribution to Equity.

36.     The Bank, meanwhile, was unable to procure a purchaser for the Lease. The Trustee then asked his special real estate counsel if it knew of anybody who would be interested in purchasing the Lease. After making inquiries of its clients who were real estate developers or private equity investors, real estate counsel advised the Trustee that it had not found a purchaser for the Lease. In addition, real estate counsel had asked the commercial brokers it dealt with if any of them would be willing to market the Lease. The answer was an unequivocal "no".

14



37.     Faced with this knowledge, Applicant began to believe that the Landlord was correct: the Landlord-centric terms of the Lease made it impossible to sell the Lease at a price that would satisfy the claims of the Landlord and the Lender. Perhaps the only way out of this quagmire was to permit the Landlord to buy back the Lease. However, the Bank remained adamant in its position that it would not take any reduction in the value of its claim. Negotiations with the Landlord ground to a halt, the Lender had not found a purchaser and the Landlord insisted that the Trustee move forward with a sale or conversion motion. The Landlord was determined that the case not be allowed to flounder any further and requested a conference before the Court. At the conference, the Trustee convinced the Court that the Estate would best be served if the Trustee were provided additional time to market and sell the Lease. The Court scheduled the next status conference for six weeks out with the expectation that the Trustee would have something more substantive to report.

**Retention of Marcus Millichap**

38.     Given all that had gone on in the case to date, Applicant was left with the belief that the only way he could satisfy the needs of his various constituencies and determine if in fact there was equity in the Lease, was to market and attempt to sell the Lease through an open auction process at which anybody, including Equity, could bid. Although M&M had previously procured potential purchasers for the Lease, Applicant feared that M&M was "tainted" because of its initial association with both the Debtor and the Landlord. To alleviate that problem, the Trustee attempted to hire a new broker. Although the Trustee and his counsel met with numerous brokers, none were interested in marketing the Lease which they unanimously believed was either "unmarketable" asset or one that would bring in less than $8 million. Ultimately, the only broker

15



willing to market the Lease was M&M.

39.    In order for the sale of the Lease to make economic sense to the Debtor's Estate, Applicant determined that the Lease could not be sold for less than $15.5 million.  Thus, the Trustee negotiated an agreement with M&M pursuant to which M&M agreed to be paid on a sliding scale basis which started at a sales price of no less than $15.5 million.  Applicant's counsel drafted many versions of the retention letter.  After the Trustee and M&M met and executed the retention agreement, the Trustee directed his counsel to prepare an application seeking authorization to retain M&M.

40.    M&M's retention was not without controversy.  Equity objected claiming the Estate should not bear the burden of the broker's commission[3] as it still claimed the right to assume the Lease.  The Office of the United States Trustee was concerned about certain aspects of M&M's retention.  The Landlord also raised concerns.

41.    The Trustee was eventually able to satisfy all concerned and by order of the Court dated May 21, 2007, the Court approved the Trustee's retention of M&M.

42.    M&M worked with the Trustee and the Lender and identified a number of potential purchasers for the Lease.  Relying on its efforts during the initial stages of the Chapter 11 case when it advertised the Ground Lease and directly contacted over 6,000 potential purchasers, M&M contacted all of the entities it believed might currently be interested in purchasing the Lease.  M&M ultimately informed the Trustee that it had located a potential purchaser who was willing to pay $16.2 million for the Lease.

---

[3]    This argument was obviously disingenuous as Equity had previously chosen to retain M&M, albeit without Court permission.

**Drafting the Proposed Form of Contract**

43.     Given that certain parties had previously expressed an interest in purchasing the Lease, and in order to bring order to the process, the Trustee directed his attorneys (both general bankruptcy and real estate) to prepare a form of contract to be sent to potential purchasers.  The Trustee believed that if all interested players were presented with a single form of contract that best protected the Estate's interests, he would then be in a position to determine which party's offer was truly the highest and best offer for the Estate.

44.     K&G worked closely with real estate counsel in drafting the form of contract. Although Proskauer is an expert in real estate matters, the Trustee directed K&G to review each iteration of the contract to make sure that it addressed applicable bankruptcy issues and was drafted in a manner most advantageous to the Debtor's Estate and the Trustee.  In fact, there were many times when the Lender and Proskauer informed the Trustee that the language he sought to insert into the contract, and the structure of the deal (particularly the timing of the sale and closing), were so one-sided that no party would ever sign the contract as contemplated by the Trustee and K&G.  The Trustee remained convinced that in order for the deal to work, it would have to work as he envisioned it.  The proposed form of contract was provided to potential purchasers in the form requested by the Trustee.

45.     Pursuant to the terms of the form of contract, potential bidders were required to make all-cash offers with no financing contingencies.  Moreover, the proposed form of contract contemplated that the closing on the sale of the Lease would occur one business day after notice of entry of the order approving the sale.  The bid solicitation and contract made clear that the Trustee would choose the highest and best initial bid to be the "stalking horse" bidder and that the other

17



parties would have an opportunity to make higher and better bids at a public auction to be held in the near future. Applicant made clear that the stalking horse bidder would be entitled to a break-up fee. In this manner, Applicant sought to encourage potential bidders to initially make their highest and best offer prior to the auction.

**Identification of Stalking Horse Bidder**

46.    To that end, the Trustee directed M&M to send each potential purchaser a copy of the proposed form of contract, as well as a cover letter that set forth the terms of the bidding procedure and advised the parties that the Lease would ultimately be sold at auction and that they would be advised of the time and date of the auction. Applicant's counsel worked with M&M crafting the cover letter to insure that it accurately reflected the bankruptcy process.

47.    M&M ultimately identified approximately 20 potential purchasers and provided the proposed form of contract and cover letter to those entities and their professionals on May 24, 2007. Although potential purchasers were obligated to perform their own due diligence, the Trustee provided financial materials and access to the Debtor's management's records and his own records.

48.    In addition, Applicant and his counsel spoke with many potential purchasers including, among others, a group of investors which included Bildirici. Although the Trustee had determined that the Estate's interests were best served by selling the Lease through an auction process, he directed his counsel to meet with the representatives of this new investment group. K&G met with the potential investors and explained that the Trustee was unwilling to permit the investors to do anything other than bid on the Lease on the same terms and conditions as every other potential purchaser. Applicant's counsel explained that the bidding process had to be fair and equal and that

18



no special terms could exist for this new group.  At the direction of the Trustee, K&G stressed that the investor group had a decided advantage (albeit bidding like everybody else) because over a certain dollar amount, any additional money bid, either by the group or another party, would go back to the holders of equity.  Nonetheless, Applicant advised the investor group that they would have to participate in the auction like any other potential bidder.

49.    Potential purchasers had until 5:00 p.m. New York City time on May 30, 2007, to submit their offer to the Trustee.  Four entities timely submitted bids for the Lease and one late bid was submitted as well.  The Trustee carefully reviewed each timely offer (including a number of proposed changes to the form of contract) and, ultimately, determined that Global Capital Holding LLC's ("Global") offer of $16.2 million was the highest and best offer.

**The Sale Motion**

50.    Having chosen a stalking horse bidder, the Trustee directed his counsel to prepare bidding terms (the "Bidding Procedures") that would ensure a fair and equitable bidding process that would enable all to bid.  K&G drafted bidding procedures that detailed the exact process by which a bid could be made including the production of financial documentation to evidence adequate assurance of future performance, the timing and notification procedure for qualified bidders, the deposit required to bid, retention of next highest and best down payment, and date and place of the auction.

51.    The Trustee directed Applicant to prepare a motion setting forth a two-part sale process pursuant to which the Trustee would first obtain approval of his proposed Bidding Procedures and then, after having received approval, solicit bids for the Lease, conduct an auction (the "Auction") of the Lease and then obtain Court-approval of the highest and best bid for the

19



Lease. K&G drafted a very detailed motion (the "Sale Motion") which was returnable on July 10, 2007 (the "Bidding Procedure Hearing").

**Objection to the Bidding Procedures Portion of the Motion**

52.    The Debtor's principal, Bildirici, interposed an objection (the "Sale Objection") to the Sale Motion asserting that sale of the Lease, as opposed to confirmation of a plan filed by Bildirici, would be "unfair" to Equity in that Equity would recover more and retain the asset if its plan was confirmed.

53.    The Trustee carefully reviewed Equity's Sale Objection. It was clear to the Trustee that Equity either failed to understand the advantages of his proposed sale or chose not to understand the merits of the Trustee's sale. Moreover, the plan of reorganization Equity proposed to file was patently unconfirmable on its face for a number of reasons including, among others, the fact that the plan: (a) was not proposed in good faith; (b) ignored the fact that Equity would be unable to establish adequate assurance of future performance under the Ground Lease; (c) failed to escrow sufficient funds for administration expenses including cure amounts; (d) included an injunction barring any party from seeking to recover on any obligation or debt, but failed to address the extant litigation between the Landlord and the Debtor; (e) contained inaccurate projections; and (f) would lead to additional litigation costs.

54.    Although the Trustee initially directed his counsel to research and prepare a detailed response to Equity's Sale Objection, he ultimately determined not to have Applicant file the response. Instead, at the Bidding Procedures Hearing, the Trustee argued to the Court why his approach (a sale on a level playing field to all bidders) was superior to Equity's unconfirmable plan which, as the Court would note at the Bidding Procedures Hearing, contained numerous



contingencies that rendered it inferior to the Trustee's proposed sale. After an exhaustive hearing at which counsel for Equity, the Office of the United States Trustee, the Landlord, the Lender and a commercial tenant in the Property argued, the Court approved the Bidding Procedures and authorized the Trustee to go forward with his proposed Auction.

55.     In accordance with the terms of the Court's order approving the Bidding Procedures (the "Bidding Procedures Order"), at the direction of the Trustee, K&G served a copy of the Bidding Procedures Order and the Sale Motion on all those required to receive it. K&G also served a copy of the sale notice on all of the Debtor's known creditors and equity holders. In addition, the Trustee directed his counsel to prepare and serve a notice of cure amount on all persons or entities who or which were party to an executory contract or unexpired lease with the Debtor.

56.     As set forth in the Bidding Procedures, in order to bid at the Auction a bidder was required to establish that it was a qualified bidder by providing the Trustee with a copy of the bidder's most current audited and latest unaudited financial statements (collectively, the "Financials") or, if the potential bidder was an entity formed for the purposes of purchasing the Lease (a) Financials of the equity holder(s) of the potential bidder or such other form of financial disclosure acceptable to the Trustee and (b) such other assurance of the potential bidder's ability to fulfill its obligations arising under and with respect to its bid as the Trustee determined was necessary in his reasonable business judgment.

57.     The Trustee spent significant time reviewing information provided to him. Applicant and his counsel analyzed the financial stability and wherewithal of the potential bidders. In many instances, Applicant sought further information or clarification from the potential bidders.

58.     In two instances, Applicant directed his counsel to meet with a potential



bidder and the Landlord's counsel to review the potential bidders' financial qualification and business acumen. Both potential purchasers were qualified to bid.

## THE GLOBAL STIPULATION

### Litigation Prior to the Bankruptcy Filing

59.     As this Court is well aware, before the Trustee could assume and assign the Lease to Global or any other successful bidder at the Auction, he had to satisfy his statutory obligations under Bankruptcy Code Section 365.  Thus, the Trustee was required to cure all outstanding obligations (both monetary and otherwise) under the Ground Lease.  This requirement thrust Applicant into the Dickensian saga that commenced in December 2002, when the pre-petition Debtor took an assignment of the Lease from CS East 44th Street ("CS") and continued throughout this Bankruptcy Case.

60.     In addition, the Landlord and the Debtor's Lender became embroiled in litigation (the "Lender Litigation").  If the Ground Lease had in fact terminated, the Lender would have been entitled to a "pick-up" lease with the Landlord effective as of the date of termination.  The parties were unable to agree on the cure terms, including costs and timing, that would enable the Lender to "pick up" the Lease.

### Litigation Continues After the Filing of the Bankruptcy Case

61.     All of these disputes, and others, carried into the Debtor's bankruptcy case. The Landlord, the Debtor and the Lender continued their battles, just within the rubric of the Bankruptcy Code.  Ultimately, however, the Landlord and the Lender were able to find some common ground and the Lender supported the Landlord's motion seeking to appoint a Chapter 11 Trustee (the "Trustee Motion").  The Landlord asserted that the Debtor's principal repeatedly

22



breached his fiduciary duties to the Debtor and its creditors and chronically disregarded the terms

of the Lease, the agreements it had entered into and the directions and Orders of this Court. The

Landlord also asserted that the Debtor repeatedly sought to delay, frustrate and impede resolution

of the sale of the Property because any proposed sale would not pay Equity in full (or a significant

lesser amount) on its investment in the Lease.

62.     The Lender supported the Landlord's Trustee Motion in the hopes that the

appointment of a trustee would put an end to the rancourous litigation, stop the accumulation of

additional costs and provide a means to have the Lender's claim satisfied and end the Lender's

relationship with an entity that was not acting as a fiduciary for its creditors.

63.     On February 14, 2007, the Court entered an order granting the relief requested

in the Trustee Motion and directing the appointment of a Chapter 11 trustee with all of the powers

and duties arising under Section 1104(a) of the Bankruptcy Code.

**Applicant's Determination that the Cure Costs**
**Would Have to Be Compromised and Settled**

64.     As set forth above, even before the Lease was assigned to the Debtor, the

Landlord took the position that the terms of the Lease had not been complied with and that the Lease

was in default due to those deficiencies. Ultimately, the Landlord gave notice of Lease termination.

By the time the Trustee was appointed, even assuming that the Lease still existed, which the

Landlord vigorously disputed, the Landlord insisted that there were significant defaults under the

Lease. Specifically, the Landlord claimed there were monetary defaults comprised of millions of

dollars in legal fees and Sub-Lease proceeds, as well as non-monetary defaults related to the

Property.

65.     When the Trustee met to discuss cure costs in the context of a sale, the

23

Landlord's counsel was adamant that the Landlord would accept nothing less than one hundred percent of its legal fees and the Sub-Lease proceeds. Applicant was puzzled by the Landlord's insistence that it was owed millions of dollars in legal fees because the Debtor had advised him, repeatedly, that the Court had already ruled that the Landlord's legal fees were, at most, $300,000. Moreover, the Lender had repeatedly informed the Trustee that the Landlord was not entitled to any of the Sub-Lease proceeds.

66.    Realizing that he could not "sell" the Ground Lease until he had resolved the cure costs, the Trustee contacted the Landlord's counsel to ascertain the aggregate amount of the cure costs. Applicant was not surprised to discover that the Landlord had a very different view of the cure costs. What did surprise Applicant was the fact that the Landlord's alleged attorneys' fees had risen more than $1 million dollars since the filing of the Landlord's response to the Debtor's motion to assume the Ground Lease and that the Landlord was steadfast in its belief that it was now entitled to approximately $2 million in legal fees and an additional $2 plus million in Sub-Lease proceeds. The Trustee did not believe that the sale of the Lease would be possible absent a substantial reduction in the monetary cure costs.

67.    Because the Trustee is a fiduciary, he had an obligation to independently review the Landlord's time records and research and analyze the Sub-Lease issue. In order to do that, Applicant explained, it would be necessary for the Landlord to turn over all of its time records and be willing to discuss with Applicant the basis for such fees.

68.    Initially, the Landlord was reticent to provide its attorneys' time records or explain its fees arguing that it was exactly the type of "free discovery" that it had objected to in the context of the Debtor's motion to assume the Ground Lease. Applicant was ultimately able to



persuade the Landlord's attorneys that the parties would not be able to move forward with the sale (which the Landlord had repeatedly stated it was in favor of), absent a full resolution of the cure costs. The Landlord's counsel proceeded to turn over, on a piecemeal basis, time records from Tofel & Partners, Weil Gotshal & Manges and Itkowitz and Harwood for the period commencing in January 2005 and continuing through June 2007.

69.    In order to determine if the legal charges were reasonable and within the rubric of Section 365, the Trustee directed his counsel to analyze, review and categorize each of the attorney's time records.

70.    After struggling with the voluminous time records, it became clear to K&G that its review and categorization of the Landlord's and the Lender's time records could not be performed in a vacuum. The Trustee directed his counsel to review more than four redwelds worth of pleadings relating to the previous and current litigation between and among the Debtor, the Landlord and the Lender.

71.    The Trustee's counsel spoke at length with the Landlord's counsel, reviewed the litigation pleadings and referenced the relevant provisions of the Ground Lease. After summarizing these documents and providing the Trustee with memos regarding the salient pleadings, case law and documents, Applicant began to see a very different picture than the one he had initially envisioned. Although the Trustee had originally begun the review process believing the Landlord was not entitled to the fees it claimed, and with a predilection towards Equity (which he saw as the "underdog"), Applicant's independent analysis soon painted a different picture. What emerged was a pattern of obstruction and dereliction of duty on the part of Equity and continued attempts to preserve the value of the Lease on the part of the Landlord.



72.     In addition, although the Debtor repeatedly insisted that the Court had ruled that the Lease had not terminated and that the aggregate amount of fees owed to the Landlord was $300,000, a careful review of the transcript of the March 10, 2006 hearing on the Debtor's motion to assume the Ground Lease revealed that neither of these assertions were true. With respect to the $300,000, the Trustee determined that the Court specifically stated that the $300,000 was not a ruling on the cure amount, rather it represented the maximum amount the Court thought the Debtor would be willing to pay for the Lease and provide a starting point – if the Debtor were unwilling to put up $300,000 there would be no preceding on the Assumption Motion. Moreover, the Court's ruling on the termination or existence of the Lease was not a final order. In fact, the Landlord's appeal to the District Court was an appeal of an interlocutory order.

73.     Thus, as a result of his analysis, the Trustee concluded that the legal portion of the cure cost incurred by the Landlord protecting its asset aggregated at least $1,940,662.42 through June 2007.

74.     The Trustee's analysis of the litigation history of the case also led him to conclude that the Landlord would not be willing to concede that it was not entitled to the Sub-Lease proceeds. The Trustee and his counsel researched this issue and concluded that the Landlord's position was incorrect and did not reflect the current state of the law. Rather, the Trustee believed that the Sub-Lease claim reflected a penalty provision to make the Landlord whole. Because the Landlord was always paid the rent owed to it pursuant to the Ground Lease, the Trustee did not think the Landlord would prevail in its efforts to recover the Sub-Lease claim (the "the Sub-Lease Dispute"). Nonetheless, the Landlord continued to disagree, arguing that absent specific language stating that the Sub-Lease payments were security for amounts owed to the Landlord, the Sub-Lease



payments constituted additional amounts owed to the Landlord – not a penalty. Because the language in the Lease was unusual in the protections provided to the Landlord, there was no law directly on point. Thus, the Sub-Lease issue remained open for further costly and time-consuming litigation.

75.    The Trustee believed that if the Landlord were deemed correct in its interpretation of the Sub-Lease Dispute, the sale price offered by Global (or any other potential purchaser) would be insufficient to satisfy the cure costs and no sale could ever be effectuated. Thus, it was apparent to the Trustee that the Sub-Lease Dispute would have to be consensually resolved before the Lease could be assumed and assigned.

76.    Applicant knew that resolution of the Landlord's issues would not assure the sale of the Lease. In order to ensure that there was no "cloud" on the title to the Ground Lease and maximize the value of the Ground Lease, issues relating to the existence of the Ground Lease, the Lender Litigation and the Lender's cure costs under its loan documents all had to be resolved before a sale could go forward.

77.    The Trustee did not have the luxury of time on his side. Rather, a sword of Damocles dangled over his head as the Landlord repeatedly asserted that the case should be converted to a Chapter 7 case, the insurance carrier raised serious issues about the coverage on the Property and the tenants grew increasingly unhappy with the state[3] in which Equity had maintained the building. The Trustee believed an immediate and all-encompassing solution had to be reached. Accordingly, Applicant commenced tri-party negotiations with the Lender and the Landlord.

---

[3]    Equity had failed, among other things, to maintain the air conditioning in the lobby and to insure proper elevator maintenance.

27



**Negotiating The Tri-Party Stipulation**

78.    To a certain extent, the Lenders's issues were easier to resolve.  Pursuant to the terms of the Consolidated, Amended and Restated Mortgage, Security Agreement and Assignment of Leases and Rents dated December 4, 2002 and the Consolidated Amended and Restated Promissory Note dated December 4, 2002, the Lender was entitled to all of the legal fees it sought.  Applicant directed his counsel to review the Lender's attorneys' time records on an entry-by-entry basis.  Thereafter, the entries were categorized and compiled in spread-sheet form.  The Trustee concluded, within the context of these documents, that the Lender was entitled to all of its legal fees.  Applicant then attempted to convince the Lender to compromise its legal fees.  The Lender was not willing to do so.  What the Lender was willing to do, however, was provide the Estate consideration by agreeing that the Lease had not terminated.  Thus, it removed a potential cloud upon the Trustee's sale of the Lease.

79.    Although the Trustee was repeatedly advised by both the Lender and the Landlord that he would never be able to negotiate a resolution of their dispute or obtain a purchaser willing to pay an amount sufficient to satisfy their claims, the Trustee persevered. As part of his work, Applicant had to facilitate the resolution of the Lender Litigation.  Because both parties had spent so many years in rancourous litigation, neither party was willing to be seen as the party that "gave in" on any aspect of the negotiations.  Although it took many, many days of negotiating, and ultimately nine iterations of the form of agreement, the Trustee was ultimately able to negotiate a consensual resolution of the parties' claims. Specifically, the Trustee persuaded the Landlord to reduce its legal fees from $1.9 million to $1.7 million, waive its rights to all of the Sub-Lease Proceeds, agree to cease litigating the Lender Litigation and agree that the Lease existed and was



capable of being assumed and assigned. The Lender, while not willing to compromise its legal fees, agreed to the cessation of the Lender Litigation and to the existence of the Lease.

80. Ultimately, the stipulation between and among the Trustee, the Lender and the Landlord (the "Global Stipulation") ended years of extensive and expensive litigation between the Debtor, the Lender and the Landlord. The Stipulation also put an end to the uncertainty surrounding the Landlord's assertion that the Lease terminated pre-bankruptcy and allowed the Trustee to proceed with the auction sale of the Debtor's only asset, the Lease.

81. The Trustee directed K&G to draft an exhaustive application (the "Global Stipulation Application") pursuant to Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 9019 which detailed the arduous litigation history of the case (both within and without the bankruptcy case), provided a detailed examination of the Lease provisions allowing the Landlord's attorneys' legal fees, analyzed the legal basis, or lack thereof, for awarding the Landlord some or all of the Sub-Lease Proceeds, characterized and itemized the Landlord's attorneys' fees and explained and provided a record for the determination that the Global Stipulation, and the settlements it encapsulated, was well within the lowest range of reasonableness and that the Trustee exercised good business judgment in determining to enter into the Global Stipulation.

82. Because of the timing of the Auction and the mandates of Bankruptcy Rule 2002(a)(3), the Trustee directed his counsel to move by Order to Show Cause. The Court signed Applicant's Order to Show Case and a hearing on the relief requested in the Global Stipulation Application was scheduled for August 8, 2007.

83. Equity filed an Objection to Cure Claim dated August 6, 2007 (the "Global Stipulation Objection") in which it asserted, among other things, that: (a) the Landlord's legal fees



could be reduced by as much as 75%; (b) the Trustee's settlement rendered the Debtor's Estate administratively insolvent; and (c) the Trustee was paying the Lender more than it demanded.

84.    Applicant carefully reviewed the Global Stipulation Objection and directed his counsel to prepare and file a response to the Global Stipulation Objection.

85.    Applicant appeared before the Court and argued in support of the Global Stipulation Application. Equity also appeared and argued its position. The Court ruled from the bench, approving the Global Stipulation and finding, among other things, that the Global Stipulation: (a) resolved the threshold issue of whether the Lease even existed; (b) resolved the Sub-Lease Dispute; (c) solved the non-economic cure cost issue by establishing and capping the cost of the non-monetary cure costs with the creation of a $200,000 repair escrow; and (d) reduced the Landlord's escalating allowable legal fees. The Court also specifically and explicitly overruled Equity's objection that because the Landlord had failed to file an objection to the cure notice the Trustee had filed, the Landlord had waived the right to object to the cure amount and that failure to approve the Global Stipulation would not preclude the sale of the Lease.

86.    By Order dated August 9, 2007, the Court approved the Global Stipulation (the "Global Stipulation Order").

### THE AUCTION AND SALE OF THE LEASE

87.    At the conclusion of the hearing on the Global Stipulation, the Trustee conducted an auction of the Trustee's right, title and interest in the Lease. There were two qualified bidders at the Auction: Global and G Squared Management LLC ("GSM") and G Squared Associates LLC ("GSA"; GSA and GSM are collectively referred to hereinafter as "G Squared"). G Squared was the winning bidder with a bid of $16.7 million. At the conclusion of the Auction,



G Squared executed a Sale-Purchase Agreement (the "Agreement"), the exact form of which had been provided to it prior to the Auction, pursuant to which it contracted to purchase the Trustee's right, title and interest in the Lease.

88.     Later that day, at a hearing before the Court, the Court approved the sale of the Lease to G Squared finding that the Trustee was within his business judgment and that the sale to G Squared would effect a greater recovery than the Estate could receive through the plan proposed by Equity in its initial objection to the Bidding Procedures.

89.     By Order of the Court dated August 9, 2007 (the "Sale Order"), the Court approved the sale of the Trustee's right, title and interest in the Lease to G Squared.

## THE ESCROW MOTION

### G Squared Defaults and Demands Return of Its Down Payment

90.     Section 3 of the Agreement executed by G Squared and the Trustee specifically provided that: "[t]he consummation of the purchase and sale transaction contemplated hereby (the "Closing") shall take place at 10:00 A.M. on the next business day after notice of the entry of the Sale Order (the date on which the Closing occurs being referred to herein as the "Closing Date") (emphasis in the original).

91.     In accordance with the terms of the Agreement, on August 9, 2007, the Trustee provided notice (the "Notice") to G Squared that the Closing (as defined in the Agreement) would take place at 10:00 A.M. on Monday, August 13, 2007, at the offices of Proskauer, 1585 Broadway, New York, New York 10036. On August 9th the Trustee's counsel also orally advised the G Squared attorney listed in the Agreement of the Trustee's intent to close the sale of the Lease on August 13th.



92.     Notwithstanding delivery of the Notice, G Squared appeared at the Closing but was not ready, willing and able to close.  Instead, it asserted, both orally and in writing (the "G Squared Letter"), that it had not been provided with proper notice of the Closing.  The Trustee spent considerable time that day discussing with real estate counsel how it wished to proceed to best protect the Estate's interest.

93.     Prior to the scheduled August 13th closing, and in accordance with Section 3 of the Agreement, the Trustee had offered to extend the Closing date, subject to G Squared providing the Trustee with an additional $500,000 down payment (not the payment of an extension fee) and the written authorization to release the full amount of the $1.67 million down payment ("Down Payment") from escrow to evidence G Squared's commitment to close promptly on September 5, 2007.  G Squared refused such opportunity and did not offer a counter-proposal.  Instead, G Squared provided the G Squared Letter to the Trustee's special real estate counsel at the attempted closing and claimed therein the right to the return of its Down Payment and objected to the release of the escrowed funds to the Debtor's Estate.

94.     In response, the Trustee served a demand notice (the "Trustee's Demand") on the escrow agent seeking the release of the Down Payment.

95.     After serving the Trustee's Demand, Applicant and his counsel spent considerable time attempting to negotiate a resolution of the Down Payment dispute.  Although the Trustee believed the parties had reached an agreement in principal, when he received the revised version of the stipulation from G Squared's bankruptcy counsel, the revised stipulation contained terms entirely unacceptable to the Trustee and well beyond the scope of his negotiations. Specifically, G Squared sought to bring in a new participant to help fund the transaction and wanted



an extension of time in which to close the transaction.

96.     Bringing in a new purchaser would have violated the terms of the Agreement and permitted G Squared to alter the contract in a manner not provided to other potential purchasers. In addition, it would have provided the Landlord and Equity an opportunity to object to the sale. Finally, Applicant believed that the change in terms, combined with G Squared's inability to close the transaction on August 13, 2007, demonstrated G Squared's inability or unwillingness to close on the deal.

**The Trustee Decides to Proceed to Close with Global**

97.     Once it became evident that G Squared was not going to be able to close on August 13, 2007, the Trustee began the process of closing with Global.  Global had initially informed the Trustee that it would need to close either in early August or if not, sometime in early Fall.  In order to grant Global such an extension, the Trustee required Global to agree to immediately release the $1.62 million down payment he was already holding, pay an additional $80,000 towards the down payment and agree to release any and all defenses Global might have to the Estate's retention of the $1.7 million down payment.  Applicant worked with real estate counsel crafting a letter agreement (the "Global Agreement") that embodied these terms and Global executed the Global Agreement on August 20, 2007.

**Applicant Files a Motion Seeking the Release of the Down Payment**

98.     When G Squared refused to execute the stipulation in the form contemplated by the Trustee or return the Down Payment to the Trustee, the Trustee directed his counsel to prepare and file a motion (the "Escrow Motion") seeking the return of the Down Payment.

**Objection to the Escrow Motion and the Court's Ruling**

33



99.    G Squared objected to the relief requested in the Escrow Motion and filed (a) its Objection to Motion for Authority to Release Funds from Escrow (the "Escrow Objection") and (b) affidavits by both Joshua Angel, Esq. and Larry Glick, Esq.  In the Escrow Objection, G Squared argued that the Trustee acted arbitrarily and sought to obtain a windfall in the form of the Down Payment.  It also argued that keeping the Down Payment was contrary to public policy.

100.    Applicant reviewed the affidavits submitted by G Squared, the Escrow Objection and the law cited therein.  Applicant discussed the pleadings with his counsel and because the Trustee believed that the affidavits submitted by Messrs. Glick and Angel did not accurately portray the essence of the transaction between the Trustee and G Squared, directed his counsel to prepare an affidavit explaining the course of the negotiations.  In addition, because G Squared had only provided the Court with a partial analysis of the *Target Two* line of cases and did not include other applicable case law that highlighted why the Trustee's conduct was in keeping with the laws of the State of New York and the District Court for the Southern District of New York, the Trustee, through his counsel, prepared and filed his Response to the Objection to the Escrow Motion.

101.    The Court conducted a hearing on the relief requested in the Escrow Motion on September 12, 2007.  At the commencement of the hearing, the Court asked both the Trustee and G Squared's counsel if either party intended to call witnesses.  Both parties determined to rest upon their submissions and oral argument.  Both Applicant and counsel for G Squared made lengthy arguments to the Court and answered the many questions interposed by the Court.

102.    At the conclusion of the hearing, the Court read its decision into the record. The Court concluded, among other things, that even applying the "equitable gloss" required by Judge Scheindlin in her *Target Two* decisions, the Trustee had acted in the best interest of the Estate by

34



determining not to afford G Squared an opportunity to extend the time to close on the Agreement given the fact that it did not have the necessary financing in place. The Court also held that the Trustee was justified in not allowing G Squared to acquire a third investor given the history of the case, the fact that such an act would change a material term of the contract and, in effect render the Bidding Procedures moot.

103.    The Court entered an order dated September 12, 2007 (the "Escrow Order") granting the relief requested in the Escrow Motion.

## THE GLOBAL CLOSING

104.    As contemplated by the Global Agreement, Global had to close on the purchase of the Lease on or before October 11, 2007 or forfeit its down payment. As the date of the closing drew close, it became clear to Applicant that Global was having difficulties obtaining the financing necessary to close on the purchase of the Lease.[4]

105.    At one point, after Global had sought financing from many, many sources, Global asked Applicant if it could assume the Debtor's debt. The Trustee considered the request in light of the form of contract and determined that assumption of the debt would not be in compliance with the terms of the contract or this Court's Orders. The Trustee informed Global that the transaction would have to remain an all-cash, new money transaction.

106.    Global also had problems finding a title company that would insure title. Global finally found a title insurance company but issues arose when the title company realized that G Squared had appealed the Escrow Order. Applicant and his counsel were ultimately able to

---

[4]    Although Applicant was somewhat surprised by this turn of events given Global's assets and its members' real estate experience, it did appear to validate the Landlord's position that the Lease was not worth more than the Lender's secured claim and the parties' cure costs.

persuade the title company to provide the necessary insurance.

      107.    The sale closed on October 11, 2007.

## APPELLATE LITIGATION

### Appeal of the Global Stipulation Order

      108.    On August 29, 2007, Joseph Bildirici appealed the Global Stipulation Order. Tellingly, Bildirici neither sought a stay of the sale to G Squared nor appealed the Sale Order.

      109.    Applicant directed his counsel to prepare his Counter-Designation of Additional Items to be Included in the Appeal and the issue to be presented.

      110.    As of October 12, 2007, the appeal was docketed in the Clerk's office of the Southern District of New York. The case was assigned to District Judge Colleen McMahon. Magistrate Theodore H. Katz has been designated in this case. Pursuant to Bankruptcy Rule 8009, Bildirici's brief has been filed. The Trustee has directed his counsel to prepare his brief which must be filed and served on November 16, 2007. Bildirici's reply brief is due ten days after.

      111.    The appeal remains extant.

### Appeal of the Escrow Order

      112.    On October 1, 2007, G Squared appealed the Escrow Order arguing that the Bankruptcy Court had erred for a multitude of reasons including the fact that its ruling granted the Debtor's Estate an inequitable windfall, the Trustee's decision not to grant G Squared an extension of time to close was arbitrary and that the Court had seemingly not considered G Squared's argument that it would be inequitable to permit the Trustee to retain the entirety of the Down Payment.

      113.    Applicant directed his counsel to prepare and file the Trustee's Designation of Additional Items to be Included in the Record on Appeal and Statement of Issues on Cross-

36



Appeal.

114.    This appeal has docketed in the Clerk's office of the Southern District of New York. The case was assigned to District Judge Paul Crotty. Magistrate Henry Pittman has been designated in this case. Pursuant to Bankruptcy Rule 8009, G Squared's brief must be filed and served by November 15, 2007.

115.    As of the date hereof, Applicant has not received a copy of G Squared's initial brief to the District Court. The appeal remains extant.

<u>APPLICANT'S REQUEST FOR COMPENSATION</u>

116.    On this First Application for Trustee's Commission, Applicant seeks an order authorizing the payment of Trustee's Commission in the amount of $486,899.91(90% of $540,990.90). Pursuant to 11 U.S.C. § 326, the calculation of commission is based on $17,883,330.10 recovered and disbursed for the benefit of the Estate through October 31, 2007, through the sale of the Lease and the related sale disbursements and disbursements necessary to maintain the Estate, as set forth above. The Trustee has attached a Form 2 (as Exhibit A) showing the Estate disbursements to date. Below is an itemized description of the disbursements made through October 31, 2007 which also includes and the anticipated upcoming distribution for legal services provided to the Estate by the Chapter 11 Trustee's professionals through October 31, 2007, totaling $17,883,330.10:

| | |
|---|---|
| Checking Account xxx-xxxxxxx66<br>    Operating expenses | $    307,564.03 |
| Closing Account xxx-xxxxxxx69<br>    Closing expenses and adjustments | $14,667,183.75 |
| Norwax Checking Account xxxxxxxxxxxxxx72<br>    Operating expenses | $ 2,278,200.57 |
| Anticipated Legal Fees to be disbursed at this time<br>    Kittay & Gershfeld, P.C. Legal Fees ($495,474.75) | $    630,381.75 |

37



Kittay & Gershfeld, P.C. Legal Expenses ($11,907.00)
Proskauer Estimated Fees and Expenses ($123,000)
Total:                                                $17,883,330.10

117.    The compensation requested by Applicant is $486,899.91(90% of

$540,990.90).  No previous allowance has been made to Applicant herein.

| | |
|---|---|
| TOTAL RECEIPTS, including earned interest | $17,883,330.10 |
| MINUS EXEMPTIONS | (          0.00) |
| TOTAL:  Trustee's commission based on this figure | $17,883,330.10 |

PERCENTAGES USED PURSUANT TO U.S.C. §326(a):

| | | |
|---|---|---|
| 25% on the 1st $5,000 | = | $   1,250.00 |
| 10% on the next $45,000 | = | $   4,500.00 |
| 3% on the next $17,833,330.10 | = | $ 534 999.90 |
| Total | = | **$ 540,990.90** |

118.    No agreement or understanding exists between Applicant and any other person

for the sharing of compensation received or to be received for services rendered in connection with

this case.

119.    Notice of this Application will be sent to all known creditors of the Estate and

all parties who have filed Notices of Appearance and Demand for Service of Papers.

<u>RELIEF REQUESTED</u>

120.    The results accomplished in this case are extraordinary.  The Court appointed

the Trustee in the context of a case where each of the players – the Landlord, the Lender and the

Debtor – refused to have anything to do with each other.  As this Court is well aware, there were only

two facts the Landlord and the Lender agreed on: (1)  the Trustee would never be able to obtain an

offer for the Lease that would satisfy the Lender's claim, let alone the requisite cure costs owing to

the Landlord and the Lender; and (2) the pugnacious, intemperate behavior of the other party (which

could, and at times did, include threatening, screaming and hanging up on phone calls) would make



it impossible to ever negotiate a resolution of the cure costs and the litigation between the parties. Working diligently for months on end, the Trustee proved the Landlord and the Lender wrong. The Trustee located not one but two purchasers and negotiated a tri-party settlement that compromised and settled the monetary and non-monetary cure costs in a way which resulted in the potential for a significant distribution to the Debtor's unsecured creditors and the possibility of a distribution to Equity. The Trustee's unique contribution to this case was expressly highlighted by the Landlord's counsel at the Sale Hearing when he stated:

> We would not be here today but for the efforts of Mr. Kittay and his staff ... And I think it is noteworthy where we are today, and frankly, to Ms. Siegel and Ms. Gershfeld's and Mr. Kittay's credit. You should know that; the Office of the United States Trustee should know that. They have our appreciation and respect for bringing about the best possible result after years of really difficult and unpleasant experiences.

121.    The commission sought is justified by the unique facts of this case. As a result of the Trustee's efforts: (1) the Lease remains in the stream of commerce as a result of a fair and equitable sale which gave all parties (including Equity) the opportunity to be the winning bidder; (2) the building has been in "good hands," much-needed repairs have been made and tenants' missing security deposits have been replaced; (3) the Landlord's adequate assurance needs have been met, it has been paid for its legal fees, and years of litigation have been amicably resolved; (4) the Lender has been paid in full and years of acrimonious litigation ended; (5) the broker, which had brought the actual purchaser to the Debtor prior to the Trustee's appointment, has been paid for its services (a commitment the Debtor was not prepared to fulfill); and (6) if successful in the G Squared appeal (and the Trustee believes he will be), all holders of general unsecured claims will be paid in full, with interest, and there will be funds available to make a significant distribution to

39



the holders of Equity.

122.    While the Trustee's time records show most of the actual "hours" spent to achieve these exceptional results, time records cannot reflect the "non-billable" efforts that made this case a success: (i) the Trustee's ability to work with the parties' very different but very developed personalities; (ii) the intensity of negotiations colored not only by the parties' interpretation of the law and its application to the facts but also by a history of rancourous litigation that required the Trustee to appease egos and personalities that often stood in the way of effective, constructive negotiations; and (iii) the sleepless nights spent pondering how to make the case work which, while they don't get billed, often provided inspiration for how to proceed.

123.    The Trustee accomplished all of the above while facing great personal liability.  Immediately upon being appointed Chapter 11 Trustee, the Trustee met with the Debtor's principals and, in his initial review of the Debtor's books and records, determined that the Debtor's principals or the equity-owned management company the Debtor hired and paid, had commingled and utilized the tenants' security deposit for operational expenses.  Given the unsettled nature of the case law, the Trustee bore a substantial risk that he would be personally liable for the value of the security deposits.

124.    Another risk shouldered by the Trustee was the risk of a fire or other catastrophe affecting the building.  As set forth above, the insurance coverage maintained by the Debtor was inadequate to protect the creditors or the Debtor and there were no free funds available to pay for it.  In the month it took the Trustee to negotiate with the parties and carriers to obtain insurance suitable to the Landlord and broad enough to protect the Debtor and its creditors, he personally bore the risk of substantial loss.



125.    In addition, throughout this case, the Trustee and his professionals bore the substantial risk that they would not be paid at all.  Nevertheless, the Trustee and his law firm took those risks, worked with all of the parties and, ultimately, made the impossible a reality.

126.    To deny the Trustee the requested commission would result in a windfall to Equity and would be unjust and inequitable.  Equity mismanaged this Debtor's Estate; Equity caused the vast bulk of the cure costs the Estate was forced to satisfy as a result of its improvident and aggressive litigation strategy; and Equity continues to cause the Estate to expend monies in opposing Equity's appeal of this Court's Order approving the Global Stipulation.  The Trustee more than earned the compensation he seeks from the Court today and respectfully requests that the Court so acknowledge.

127.    Accordingly, Applicant hereby requests that the Court approve as reasonable the full amount of commission requested for the Compensation Period ($540,990.90), as described in this Application.  In light of the benefits to the estate, Applicant has determined to seek approval of the full amount of commissions and seek a distribution at this time of 90% of the commissions sought ($486,899.91).

128.    In addition, as reflected in the time records of the Trustee and his staff which are annexed hereto as Exhibit B, services have been rendered in a highly efficient manner.

129.    Applicant respectfully requests that the Court dispense with the necessity for filing a memorandum of law in connection with this motion because the relief requested does not involve any complicated legal issues.

41



WHEREFORE, Applicant respectfully requests that this Court issue an order (a) approving the reasonableness of the interim compensation for professional services rendered by Applicant as Trustee in the amount of $540,990.90, (b) directing payment of $486,899.91 representing 90% of the commissions requested and © granting such other and further relief as may appear just and proper.

Dated:  Tarrytown, New York
       November 7, 2007

                       KITTAY & GERSHFELD, P.C.
                       Attorneys for Trustee of East 44th Realty, LLC


              By:  /s/ David R. Kittay
                  David R. Kittay  (DK-0481)
                  100 White Plains Road
                  Tarrytown, New York 10591
                  (914) 332-8000

42



UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

Return Date: December 5, 2007
Return Time: 10:00 a.m.

------------------------------------------------------x
In re:                                    :
                                          :        Chapter 11
                                          :
EAST 44TH REALTY, LLC,                    :        Case No. 05-16167 (RDD)
                                          :
                    Debtor.               :
------------------------------------------------------x

## AFFIDAVIT OF NO FEE SPLITTING

STATE OF NEW YORK          )
                           )        ss:
COUNTY OF WESTCHESTER      )

   David R. Kittay, being duly sworn, deposes and says:

   1. I am the president of the law firm of Kittay & Gershfeld, P.C. counsel to the Trustee of the Debtor's estate, and submit this Affidavit in support of the First Application of David R. Kittay for Interim Statutory Commission (the "Application") for services rendered during the period of February 14, 2007 through October 31, 2007.

   2. Pursuant to 18 U.S.C. § 155, I have not entered into any agreement, written or oral, express or implied, with any other party in interest or any attorney for such party for the purpose of fixing the amount of any fees or compensation to be allowed or paid from the estate of the Debtor.



3.      Consistent with 11 U.S.C. § 504, no agreement or understanding exists between myself with any other person or entity for the division of the compensation which I may receive as a result of the Application, nor will any division of fees prohibited by 11 U.S.C. § 504 be made.


_____/s/ David R. Kittay_____
David R. Kittay


Sworn to before me this
7th day of November, 2007

_/s/ Michelle G. Gershfeld_
Notary Public

          MICHELLE G. GERSHFELD
          Notary Public, State of New York
          No. 31-4962406
          Qualified in Westchester County
          Commission Expires February 12, 2006



UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

Return Date:  December 5, 2007
Return Time:  10:00 a.m.

------------------------------------------------------x

In re:                                                    :         Chapter 11
                                                          :
EAST 44TH REALTY, LLC,                                    :         Case No. 05-16167 (RDD)
                                                          :
                              Debtor.                     :
------------------------------------------------------x

## CERTIFICATION OF DAVID R. KITTAY
## UNDER BANKRUPTCY CODE
### SECTION 330 FOR ALLOWANCE OF INTERIM COMMISSION

David R. Kittay, Trustee, hereby certifies that:

1.      I have read the Application of David R. Kittay, Trustee ("Applicant") dated November 7, 2007, as Trustee for allowance of interim commission.

2.      To the best of my knowledge, information and belief, formed after reasonable inquiry, the Application complies with the mandatory guidelines.

3.      To the best of my knowledge, information and belief formed after reasonable inquiry, the commissions sought fall within the guidelines.

4.      The basis of the commissions sought in the Commission Application commenced on February 14, 2007. The commissions sought in the Application, which have not previously been approved as reasonable, commenced on February 14, 2007.

5.      David R. Kittay's Trustee Application does not include any request seeking reimbursement for a service purchased or contracted for or from a third party.

Dated: Tarrytown, New York
       November 7, 2007

                              By:  /s/ David R. Kittay
                                   DAVID R. KITTAY (DK-0481)
                                   100 White Plains Road
                                   Tarrytown, New York 10591
                                   (914) 332-8000

